MOORE, Judge.
Phillip Limbaugh Lackey (“the husband”) appeals from a divorce judgment entered by the Jefferson Circuit Court. Lisa Faye Lackey (“the wife”) cross-appeals.
On November 3, 2006, the husband filed a complaint requesting a divorce from the wife. On November 13, 2006, the wife answered and counterclaimed for a divorce, requesting, among other things, that she be allowed to relocate with the parties’ children to Kentucky. On April 25, 2007, the husband amended his complaint to object to the proposed change in the principal residence of the parties’ children, alleging that, through an e-mail message he received from the wife on March 28, 2007, and a certified letter he received from the wife on April 3, 2007, the wife had notified him of her intent to relocate herself and the parties’ children to Kentucky effective June 1, 2007. The wife answered the amended complaint on May 4, 2007.
After a trial, the trial court entered a divorce judgment on October 4, 2007, that, among other things, awarded custody of the parties’ children to the wife; awarded the husband visitation rights; denied the husband’s objection to the wife’s relocation of the children; ordered the husband to pay $2,000- monthly as child support; ordered both parties to participate in individual therapy for two years and ordered the husband to pay for the cost of the therapy; ordered the husband to pay the premiums for the wife’s medical insurance for three years, pursuant to the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-1169 (“COBRA”), and the husband’s health-insurance plan; ordered the husband to provide medical- and dental-insurance coverage for the children; ordered the wife to pay the first $200 of noncovered medical expenses for the children and the husband to pay the remainder of those expenses; ordered the husband to maintain $1,000,000 in life-insurance coverage on his life for the benefit of the wife; ordered the husband to *396 pay the wife $1,500 monthly in periodic alimony; awarded a Jeep vehicle to the wife; awarded the husband a Volkswagen automobile; awarded certain personal property to each party; ordered each party to pay the debts in his or her individual name; and ordered the husband to pay $50,000 in attorney fees to the wife.
Both parties filed postjudgment motions, and, on January 3, 2008, the trial court entered an order noting that, pursuant to Rule 59.1, Ala. R. Civ. P., the parties had consented to extend the time for the court to rule on the postjudgment motions until February 19, 2008. On February 19, 2008, the trial court entered an order amending the final judgment. Specifically, the trial court amended certain findings of fact, corrected certain clerical errors, modified the visitation provisions, and deleted a restriction regarding same-sex overnight guests. On March 28, 2008, the husband filed his notice of appeal. The wife filed her notice of cross-appeal on April 10, 2008.

Facts

The parties met at the University of Kentucky Hospital in Lexington, Kentucky. At that time, the husband was completing an internship in pediatric medicine and the wife was working as a registered nurse. At the completion of the husband’s internship, he moved to Birmingham to complete a general-surgery residency at the University of Alabama at Birmingham Hospital. A few months later, on October 17, 2000, the parties married, and the wife joined the husband in Birmingham and began working as a nurse there.
This marriage was the second for the wife and the first for the husband. The wife had a son from her previous marriage (“the son”). The son was 11 years old at the time of the trial and had lived with the parties throughout the parties’ marriage. During that time, the son had no contact with his biological father and the wife received no child support on the son’s behalf. Two daughters were born of the parties’ marriage; the parties’ daughters were six years old and two years old, respectively, at the time of the trial.
After the parties married, the wife’s parents, who live in Toronto, Canada, purchased a home in Birmingham and allowed the parties to live there for $500 a month. After four months, however, the husband told the wife’s parents that they could not afford the rent, and, thereafter, the wife’s parents allowed them to live in the house rent-free. The wife’s father testified that he and the wife’s mother had contributed approximately $27,000 a year to subsidize the parties’ income.
During the time the husband was completing his general-surgery residency, the parties began having marital problems. The husband testified that he had discovered that the wife had run up charges on a credit card. He and the wife both testified that he had berated her about those charges. The husband admitted that he had been verbally abusive to the wife. The parties eventually separated, and the wife filed for a divorce. Around this same time, the parties discovered that the wife was pregnant with their younger daughter. The parties attended marriage counseling; they subsequently reconciled, and the wife dismissed her complaint for a divorce. The wife testified that the reconciliation had been contingent on the husband’s taking an antidepressant and continuing to attend marriage counseling. She testified, however, that the husband had discontinued taking his antidepressant and had stopped attending counseling a few months after the reconciliation.
The husband completed his general-surgery residency in June 2005. He then moved to Chattanooga, Tennessee, to com- *397 píete a two-year residency in plastic and reconstructive surgery. The husband’s annual salary for that two-year residency was approximately $42,000. Both parties testified that they had agreed that the wife and children would stay in Birmingham because they could not afford to move to Chattanooga. The husband testified that, while he was living in Chattanooga, he traveled to Birmingham three weekends a month and sometimes during the week. The wife testified that, during those two years, the husband had come to Birmingham only two times during the week.
Around July 2005, the wife quit her job as a nurse to stay at home with the children. She testified that one of the reasons she had quit working was that the husband was not living in Birmingham and the husband’s mother was no longer able to care for the children.
During the husband’s plastic- and reconstructive-surgery residency, he interviewed for jobs in Auburn, Alabama, Cull-man, Alabama, and Savannah, Georgia. The parties eventually settled on the job in Cullman, and the husband accepted an offer to join a practice there upon the completion of his residency. The husband testified that the wife was happy with that choice because, among other things, Cull-man was closer to her relatives in Kentucky. The husband testified that his starting base salary would be $175,000 and that he would be eligible for a productivity bonus. The husband would also be given an $87,500 loan that would be forgiven under certain circumstances.
During the fall of 2006, the parties again began having marital problems. The husband testified that the wife had informed him that she had about $25,000 in credit-card debt of which he had been unaware. The wife testified that the husband knew that she had been using the credit cards. She testified that she had had to use the credit cards because the husband’s salary alone was not enough to support the family. Their relationship deteriorated, and, eventually, in October 2006, the wife told the husband that she wanted a divorce.
The husband completed his plastic- and reconstructive-surgery residency in June 2007. The husband testified that, because of the pendency of the divorce proceedings, he had decided not to join the practice in Cullman. Instead, he had decided to stay in Birmingham and complete a one-year fellowship in aesthetics and breast-reconstruction surgery. His annual salary at the time of the trial was $42,000, and he was scheduled to complete the fellowship in June 2008. At the time of trial, the husband was living in an apartment in Vestavia, Alabama.
During the pendency of the divorce action, the husband had visitation with the children on the first and third weekends of each month as well as telephone visitation.
The wife testified that she had been the primary caregiver for the children and that the husband had worked long hours and had spent limited time with the children during the parties’ marriage. The husband, on the other hand, testified that he was involved in the children’s lives. The wife testified that there had been an incident in May 2002 when the husband had refused to allow her to take the older daughter with her and the son to the son’s baseball game. She testified that she had kicked the husband’s shin, had taken the older daughter out of his arms, and had walked away. The wife testified that, as she was walking away, the husband had grabbed her from behind, had pushed her against the wall, and had put his hands around her neck. Both of the wife’s parents testified that the husband had telephoned them after the incident and had told them that he had hurt the wife and that he was sorry. The husband testified *398 as to his recollection of the event. He stated that the wife had kicked and kneed him in the scrotum and that he had put her against the wall with one hand until she stopped kicking and stopped trying to grab the older daughter from him.
At the time of the trial, the older daughter was enrolled in Vestavia Hills East Elementary School and the younger daughter attended “Mothers’ Day Out” three days a week at Vestavia Hills United Methodist Church. It was undisputed that the daughters were doing well in their current environments. The older daughter was involved in activities and had many friends. The evidence indicated that the children had a good relationship with the families of both the wife and the husband.
The wife testified that she had found a three-bedroom apartment in Lexington and that the rent would be $1,130 per month. The wife testified that she had extensive family support in and around the Lexington area and that her mother, who has a home in Kentucky, would also assist her with the children. With this combined support, she expected to be able to return to work without having to place the children in day care. She testified that the husband does not have reliable family support in Birmingham and that, during the marriage, the husband had told her that he intended to move from Birmingham after completing his residency.
The wife testified that she wanted the children to maintain their relationship with the husband and his family. She testified that she had purchased a scanner and fax machine to scan documents regarding the children and fax them to the husband. She has also purchased a webcam to facilitate communication between the husband and the children. She testified that she understood that the husband had job opportunities near Lexington and that she would have no problem with the husband moving there.
At the time of the trial, the husband was 41 years old and the wife was 33 years old. There was no evidence indicating that the husband had any health problems. The wife has multiple sclerosis, but she testified that it was under control and that the disease did not prevent her from working or caring for the children.
The wife introduced the testimony of an economics expert who testified that the average yearly earnings of a plastic surgeon with less than two years’ experience was $237,000. He also testified that the average yearly earnings of a plastic surgeon over their working life is $412,000.
The husband’s debt included the following: $95,000 in student loans, $31,500 in credit-card debt, and $20,000 in attorney fees. His apartment rent is $810 a month, and his student-loan payments are approximately $425 a month. During the pen-dency of the divorce action, he gave the wife $1,650 a month. He also pays $506 a month for family health-insurance coverage.
The wife has a consolidated loan with a balance of $14,500 from Ascend Federal Credit Union; the payment on that loan is $192 per month. The wife introduced a budget that she had prepared that indicated that her expenses were $3,456 per month, not including rent. The wife testified that the only assets that the parties owned were a Jeep vehicle and a Volkswagen automobile.

Discussion

Appeal

A.
The husband’s first argument on appeal is that the trial court erred in failing to apply the Alabama Parent-Child Relationship Protection Act (“the Act”), *399 Ala.Code 1975, § 30-3-160 et seq., and that the wife failed to meet her burden of proof, pursuant to § 30-3-169.4, Ala.Code 1975, a part of the Act. Section 30-3-169.4 provides:
“In proceedings under this article unless there has been a determination that the party objecting to the change of the principal residence of the child has been found to have committed domestic violence or child abuse, there shall be a rebuttable presumption that a change of principal residence of a child is not in the best interest of the child. The party seeking a change of principal residence of a child shall have the initial burden of proof on the issue. If that burden of proof is met, the burden of proof shifts to the non-relocating party.”
The question whether the rebuttable presumption in § 30-3-169.4 is applicable to an initial custody determination is an issue of first impression. We initially note that the language of § 30-3-169.4 applies only to a “change of principal residence,” which is defined in § 30-3-161(1), Ala. Code 1975, as “[a] change of the residence of a child whose custody has been determined, by a prior court order.” (Emphasis added.) Accordingly, we conclude that, by its plain language, § 30-3-169.4 is not applicable to an initial custody determination.
Section 30-3-169.7, Ala.Code 1975, also a part of the Act, provides that, when, as in this case, the issue of relocation is presented in conjunction with an initial custody determination, “the court shall consider ... the factors set forth in Sections 30-3-169.2 and 30-3-169.3[, Ala.Code 1975,] in making its initial determination.”[1] The trial court expressly stated that it had considered those factors. Section 30-3-169.7 does not, however, require the court to apply the provisions of § 30-3-169.4. “The judiciary will not add that which the Legislature chose to omit.” Ex parte Jackson, 614 So.2d 405, 407 (Ala.1993). Thus, we conclude that § 30-3-169.7 does not require that the trial court apply § 30-3-169.4 in making an initial custody determination. Further, our review of the remainder of the Act reveals no language that would require the trial court to apply § 30-3-169.4 in making an initial custody determination.
Based on the foregoing, we conclude that the trial court applied all the applicable provisions of the Act in making its initial determination of custody.
The husband further argues that the application of the factors enunciated in § 30-3-169.3, Ala.Code 1975, should have resulted in the trial court’s denying the wife’s request to relocate with the parties’ children. As noted above, § 30-3-169.7 requires that the trial court consider the factors set forth in § 30-3-169.3 in cases such as this one. Section 30-3-169.3 sets forth the following factors:
“(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child’s life.
“(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child’s physical, educational, and emotional development, *400 taking into consideration any special needs of the child.
“(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
“(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
“(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
“(6) The preference of the child, taking into consideration the age and maturity of the child.
“(7) The degree to which a change or proposed change of the principal residence of the child will result in uprooting the child as compared to the degree to which a modification of the custody of the child will result in uprooting the child.
“(8) The extent to which custody and visitation rights have been allowed and exercised.
“(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
“(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.
“(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
“(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
“(13) Whether or not the proposed new residence of a child is to a foreign country whose public policy does not normally enforce the visitation rights of non-custodial parents, which does not have an adequately functioning legal system, or which otherwise presents a substantial risk of specific and serious harm to the child.
“(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
“(15) The reasons of each person for seeking or opposing a change of principal residence of a child.
“(16) Evidence relating to a history of domestic violence or child abuse.
“(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law.”
In the present case, it is clear that the wife had been the primary caregiver for the children. In fact, the husband had lived primarily in a different location from the children for two years leading up to the divorce. Further, although it is clear that the children had a good relationship with the husband’s family around Birmingham, the evidence indicated that the children had an equally good relationship with the wife’s family in Kentucky. Both children were young — ages six and two years — at the time of the trial. Thus, the change of residence would likely have an insignificant impact on the children. Al *401 though the children would be further away from the husband’s home in Birmingham, the wife had taken measures to ensure that the husband would be able to communicate with the children regularly. For example, she had purchased a webcam for the children to communicate with the husband and a scanner and fax machine to fax the husband documents pertaining to the children.
Further, the wife testified that the husband had not intended to make Birmingham his permanent home and that he had job opportunities near the Lexington area. The wife testified that she would have no objection to the husband’s moving near her and the children. In fact, she testified that she had sought to involve the husband in the children’s lives and would continue to do so; she also testified that she would comply with the court’s orders regarding the children.. Finally, the wife testified that moving to Lexington would allow her to work as a nurse while the children are cared for by family members, and she testified to the extensive family support she would have in Lexington. On the other hand, she testified that neither she nor the husband had family in the Birmingham area who could care for the children in her absence.
Based on the foregoing evidence, we conclude that the trial court could have determined that the factors set forth in § 30-3-169.3 weighed in favor of allowing the wife to relocate to Lexington with the children.
B.
The husband next argues that the trial court exceeded its discretion in its award of periodic alimony to the wife. He argues that the wife has the ability to earn a good salary and that any alimony award should have been only temporary. “The issues pertaining to an award of alimony and a property division are interrelated, and courts must consider them together.” Walls v. Walls, 860 So.2d 352, 356 (Ala.Civ.App.2003).
“When dividing marital property and determining a party’s need for alimony, a trial court should consider several factors, including ‘ “the length of the marriage, the age and health of the parties, the future employment prospects of the parties, the source, value, and type of property owned, and the standard of living to which the parties have become accustomed during the marriage.” ’ Ex parte Elliott, 782 So.2d 308 (Ala.2000) (quoting Nowell v. Nowell, 474 So.2d 1128, 1129 (Ala.Civ.App.1985)) (footnote omitted). In addition, the trial court may also consider the conduct of the parties with regard to the breakdown of the marriage.”
Baggett v. Baggett, 855 So.2d 556, 559 (Ala.Civ.App.2003). Further, this court has held that the pursuit of a professional license can be considered “to the extent that it produces income from which alimony ... may be paid.” Jones v. Jones, 454 So.2d 1006, 1009 (Ala.Civ.App.1984).
In the present case, the evidence indicates that the parties were married for six years. Both parties are young and in good health. The husband has the ability to earn substantially more than the wife. Even though the husband had been earning $42,000 per year before and at the time of the trial, the husband had been offered a job with a base salary of $175,000 annually. See Ebert v. Ebert, 469 So.2d 615, 618 (Ala.Civ.App.1985) (“[The] ability to earn, as opposed to actual earnings, is a proper factor to consider in deciding ... an initial award of ... periodic alimony.”). The wife testified that she had earned less than $30,000 from her most recent job as a nurse and had earned between $32,000 and $35,000 when she lived in Kentucky. The *402 two automobiles were the only property owned by the parties. The husband owed $126,500 in student loans and credit-card debt; the wife owed $14,500 on a consolidated loan.
During the marriage, the parties were never financially stable, and it is apparent that they had relied on the wife’s parents and credit cards for money. The husband testified that he had been verbally abusive. The evidence indicated that, throughout the marriage, the husband had pursued residencies in order to be able to practice as a plastic surgeon. The salaries for those residencies were modest, and the husband was required to work long hours, which resulted in the wife being left with most of the responsibility for caring for the parties’ children.
Based on the foregoing, especially the meager amount of marital property and the disparity in the parties’ abilities to earn, we conclude that the trial court did not exceed its discretion in awarding the wife periodic alimony.
C.
The husband’s next argument is that the trial court exceeded its discretion in its award of an attorney fee to the wife. He argues that he does not have the ability to pay the wife’s attorney fee and that the wife had no need for the husband to pay for her attorney fee because the wife’s parents would pay the fee.
“Whether to award an attorney fee in a domestic relations case is within the sound discretion of the trial court and, absent an abuse of that discretion, its ruling on that question will not be reversed. Thompson v. Thompson, 650 So.2d 928 (Ala.Civ.App.1994). ‘Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties’ conduct, the results of the litigation, and, where appropriate, the trial court’s knowledge and experience as to the value of the services performed by the attorney.’ Figures v. Figures, 624 So.2d 188, 191 (Ala.Civ.App.1993). Additionally, a trial court is presumed to have knowledge from which it may set a reasonable attorney fee even when there is no evidence as to the reasonableness of the attorney fee. Taylor v. Taylor, 486 So.2d 1294 (Ala.Civ.App.1986).”
Glover v. Glover, 678 So.2d 174, 176 (Ala.Civ.App.1996).
As discussed in the previous section, the husband has the ability to earn a substantial salary. The wife, on the other hand, was not employed at the time of the trial, and her ability to earn is not near the level of the husband’s. Based on the foregoing, as well as the other relevant factors, we conclude that the trial court acted within its discretion in awarding an attorney fee to the wife.
D.
The husband also argues that the trial court exceeded its discretion in ordering him to provide health insurance pursuant to his employer’s health plan and COBRA. The provision of the judgment that the husband challenges states:
“[The h]usband shall provide and pay the premiums for health and medical insurance, in order to maintain said insurance for [the w]ife’s benefit, pursuant to COBRA and [the hjusband’s health insurance plan, for a period of thirty-six (36) months from the date of entry of this Final Judgment of Divorce, and he shall cooperate and assist [the w]ife in effectuating this provision.”
The husband argues that there was no evidence presented at trial to indicate that COBRA health-insurance benefits are available through his employer.
*403 The wife agrees that there is no evidence indicating whether COBRA insurance benefits are available. She argues, however, that the judgment should be read to reflect the trial court’s intent that the husband pay health- and medical-insurance premiums for the wife for three years. We cannot, however, ignore the clear, unambiguous language in the trial court’s judgment. See, e.g., Sosebee v. Sosebee, 896 So.2d 557, 560 (Ala.Civ.App.2004) (holding that “the unambiguous terms of a judgment, like the terms in a written contract, are to be given their usual and ordinary meaning”).
Because there is no evidence to support the provision regarding COBRA insurance benefits, we reverse that portion of the judgment and remand the cause for the trial court to amend that provision of its judgment.
E.
The husband’s final argument is that the trial court erred in awarding the Jeep vehicle to the wife because, he says, there was no evidence indicating that he holds the title to the Jeep vehicle. The wife testified that the Jeep vehicle was a marital asset, and the husband presented no contrary evidence. The husband attached an affidavit in support of his post-judgment motion, in which he testified that his father had given him the Jeep vehicle as a gift but that he had not received the title to the vehicle. Even if this evidence was considered, we note that “a certificate of title is not conclusive evidence of ownership.” Crowley v. State Farm Mut. Auto. Ins. Co., 591 So.2d 53, 55 (Ala.1991). Based on the evidence presented, we find that the trial court did not exceed its discretion in awarding the wife the Jeep vehicle.

Cross-Appeal

On cross-appeal, the wife argues that the trial court should have considered the completion of the husband’s two medical residencies as marital assets to be divided. Specifically, she argues that the trial court erred in failing to award her alimony in gross to balance the equities.
In the judgment, the trial court stated: “It is inequitable in this cause that the court cannot award alimony in gross. Alabama law in prior years will not allow an award of alimony in gross which relates to a professional license or degree.” The trial court noted that, in Jones v. Jones, 454 So.2d 1006 (Ala.Civ.App.1984), this court had stated: “We are not prepared to hold [a professional degree] to be marital property in this state.” 454 So.2d at 1009.
Although in Jones the court stopped short of declaring that a professional degree cannot be considered as a marital asset, we note that, more recently, a plurality of this court, citing Jones, held: “In Alabama, a professional degree acquired by one spouse is not considered a marital asset for purposes of property division. ... Nonetheless, the possession of such a degree and the practice of a profession may be considered a marital asset to the extent that it produces income from which alimony or child support may be paid.” Pickett v. Pickett, 723 So.2d 71, 74 (Ala.Civ.App.1998) (plurality opinion); see also Jones, 454 So.2d at 1009 (“The possession of a law degree and the pursuit of the practice of law may be an asset of the marriage to the extent that it produces income from which alimony and/or child support may be paid.”).
We agree with the holding of the plurality opinion in Pickett. In the present case, the completion of the husband’s two medical residencies could not be considered a marital asset to be divided. *404 The trial court, however, had the discretion to consider all the facts surrounding the husband’s completion of the two medical residencies during the parties’ marriage, along with all other relevant factors, in fashioning its award of periodic alimony. There is no indication that the trial court did not consider this factor in its award of periodic alimony. Thus, we cannot hold the trial court in error on this issue.

Conclusion

Based on the foregoing, we reverse that portion of the trial court’s judgment requiring the husband to provide and pay the premiums for COBRA insurance benefits for the wife. We affirm the judgment in all other respects.
The wife’s request for the award of an attorney fee on appeal is denied.
APPEAL — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
CROSS-APPEAL — AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs specially.

. Section § 30-3-161 provides that the definitions provided therein are applicable "unless the context requires a different definition.” We conclude that the context in which the term "change of principal residence” is used in § 30-3-169.7, which refers specifically to initial determinations of custody, “requires a different definition” than the definition of that term set forth in § 30-3-161(1).