Rel: May 9, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

————————————————

### CL-2024-0877

————————————————

**Matthew Justin Stanford**

**v.**

**Jordan D. Anaya**

**Appeal from Dale Circuit Court**
**(DR-24-900045)**

MOORE, Presiding Judge.

Matthew Justin Stanford ("the father") appeals from a judgment entered by the Dale Circuit Court ("the trial court") divorcing him from Jordan D. Anaya ("the mother"), awarding the mother custody of the parties' child ("the child"), awarding the father specified visitation rights, and imposing upon the father a monthly child-support obligation. We

affirm the trial court's judgment in part, reverse it in part, and remand the case with instructions.

Background

The parties married in 2011. During the marriage, the father served in the United States Army. The parties relocated several times as the father was reassigned. The child was born in 2018 in Hawaii, where the father was assigned at the time. In 2020, the parties separated, and the mother relocated with the child to Florida to live with her parents. At the end of 2020, the mother, the child, and the mother's parents moved to Lineville. The parties contemplated divorcing, but they did not file a divorce complaint in any court. In January 2024, the mother gave birth to another child from a relationship with another man, Joseph Cook. In February 2024, the father obtained a reassignment to Fort Novosel. On March 5, 2024, the mother relocated with the child to Paisley, Oregon.

On March 18, 2024, the father filed in the trial court a complaint in which he sought a divorce from the mother and an award of the custody of the child. In the complaint, the father alleged, among other things, that the mother had abducted the child from Alabama, and he requested an order requiring the mother to return the child to the state. On March

19, 2024, the trial court entered an order requiring the mother to return the child to, and to keep the child in, Alabama until the disposition of the case ("the return order"). On May 20, 2024, the mother filed, pro se, an answer denying the material allegations of the father's divorce complaint. The trial court scheduled the trial of the case for June 25, 2024, and ordered that the child attend the trial.

At the trial, the trial court questioned the mother at length regarding her position on custody and visitation matters relating to the child. At the conclusion of the trial, which the child attended as ordered, the trial court entered a judgment divorcing the parties, awarding the mother sole physical custody of the child, awarding the father specified visitation rights, and ordering the father to pay the mother child support retroactive to the date of the filing of the divorce complaint, with interest. The divorce judgment further declared that the father was not the legal father of the mother's child born in January 2024. The father filed a timely motion to alter, amend, or vacate the judgment. The trial court granted the motion in part by amending the visitation provisions and recalculating the amount of interest owed on the retroactive child-support award. The father timely appealed.

## Issues

The father argues that the judgment should be reversed because, he says, the trial court assumed the role of an advocate while questioning the mother, the trial court erred in determining the father's child-support obligation and in computing the interest owed on the retroactive child-support award, and the trial court erred in making the custody and visitation awards. We do not consider the first issue, which has not been preserved for appellate review. The father did not object to the trial court's questioning of the mother during the trial. See Barbee v. State, 395 So. 2d 1128, 1133 (Ala. Crim. App. 1981) ("There was no specific objection to the fact that the trial judge was asking questions. Without objection, nothing is presented for review."). The father raised the issue in a postjudgment motion, but that objection was untimely. See Rule 103(a)(1), Ala. R. Evid. On appeal, the father argues that this court should apply the plain-error rule applicable to death-penalty cases to review the trial court's questioning, see Rule 45A, Ala. R. App. P., but the plain-error rule does not apply in divorce proceedings.

## The Evidence

The pertinent evidence relating to the remaining issues is as follows. After the parties married in 2011, they lived in Colorado,

4

Germany, Texas, and Hawaii. In 2019, after the child was born, the parties separated. The mother and the child relocated temporarily to Florida to stay with the child's maternal grandparents. The mother and the child briefly returned to Hawaii, only to leave again on May 20, 2020. Except for a short visit to Alabama in 2022, near the time of the child's fourth birthday, the father remained in Hawaii. The father testified that he had stayed in Hawaii to clear up false criminal allegations that had been made against him, but which were eventually dismissed. He testified that he had not wanted the child to visit him there because of the toxic environment surrounding him because of the criminal charges against him. After he was exonerated, the father requested a compassionate reassignment so that he could relocate to Alabama to be near the child; his request was granted on February 20, 2024, when he was transferred to Fort Novosel.

During the parties' separation, the mother became involved in a romantic relationship with a man named Joseph Cook. They conceived a child together, and that child was born on January 4, 2024. The father testified that the parties had contemplated divorcing and had even signed a divorce agreement before 2024, but, he said, he had withdrawn his consent to the divorce. After learning of the relationship between the

5

mother and Cook, the father decided to move forward with the divorce. The mother testified that she had separated from the father because of his adultery, his addiction to pornography, his post-traumatic stress disorder, and his poor financial management. According to the mother, she had since formed a stable relationship with Cook. Both parties saw no possibility of reconciliation.

When the father received his transfer orders, he informed the mother of his impending move and requested to see the child on February 22, 2024, after he arrived at Fort Novosel. The mother asked the father to sign new divorce papers, and they discussed the terms, but the mother did not inform the father that she was planning on moving to Oregon with the child. Without notifying the father, the mother relocated with the child to Oregon on March 5, 2024, to live with Cook, their child, and another child who had been fathered by Cook with another woman. The father testified that he had not known where the mother had taken the child for several weeks but that he had later learned that they had moved to Oregon. The mother eventually provided the father a mailing address and a physical address in Paisley, the latter of which, the father said, he could not locate using an Internet search engine. Although the trial court ordered the immediate return of the child to Alabama on March 19, 2024,

the mother kept the child in Oregon until the trial date, June 25, 2024. The father testified that he had not had an opportunity to personally visit with the child since December 2022, although, he said, he had often talked to the child over the telephone when the mother had permitted. The mother testified that she had not understood that the return order required her to immediately return the child to Alabama.

At trial, the father testified that he was in good standing with the United States Army, which employed him as an air paramedic. He anticipated that he would be working from 6:00 a.m. to 2:00 p.m. at Fort Novosel and that he could place the child in day care at the base when he was working. The father testified that he planned to retire in 2027 and that he could not be reassigned again to move closer to Oregon. The father testified that the child knows him and loves him. When the child saw the father at trial, the child immediately ran to him and hugged him. During the trial, the child drew a picture of the father and herself holding hands, which the trial court admitted into evidence. The father testified that he wanted the child to remain with him in Alabama, where, he said, she would be in a stable environment that offered her numerous educational and recreational opportunities and would be growing up knowing that he and his extended family loved her. The father testified

7

that the mother had often interfered with his telephone visitation with the child and that he would not have much opportunity to see the child if the child relocated to Oregon. The father also expressed concern that the mother would not abide by visitation orders entered by the trial court if she obtained custody of the child because, he said, the mother had not complied with the return order.

The mother testified that she wanted the father to relinquish his custody rights to the child and to disappear from her and the child's life, which, she said, would be beneficial to the child. The mother explained that she had been the primary caretaker for the child and that the child had rarely seen the father since she and the child had left Hawaii. She and the child were living with Cook, who worked in the United States Forestry Service, in government housing in a ranger station. The mother was not employed at the time of the trial, but she planned to apply to work as a substitute teacher at a local school in Paisley. The mother believed that the father should not have custody of the child because of alleged mental-health issues, but, she said, she did not object to the father's visiting with the child once the father and the child were fully reintroduced. The mother did not present any medical evidence to support her allegations regarding the father's having mental-health

issues, and she admitted that, as an air paramedic, the father was trained and fit to render aid to promote the health, safety, and welfare of other people.

<u>The Judgment</u>

In the pertinent parts of the judgment, as amended, the trial court rejected the father's contention that the mother had abducted the child and had wrongfully retained the child in Oregon because, the trial court said, the mother had returned with the child to Alabama for the trial of the case. The trial court awarded the parties joint legal custody of the child and awarded the mother sole physical custody of the child. The trial court awarded the father visitation with the child in Oregon on every weekend that was followed by a Monday federal holiday or a Monday with no scheduled activity for the father; during spring break each year; each summer throughout the month of June; and Thanksgiving and Christmas holidays in odd-numbered years. The trial court ordered the father to pay the mother $668 per month in child support retroactive to March 2024. The trial court determined that the father owed a child-support arrearage of $2,004, plus interest of $75.17, which the trial court ordered the father to pay at a rate of $50 per month. In addition, the

judgment required the father to maintain the child on his health insurance.

Analysis

We first address the father's challenge to the custody and visitation awards. The father primarily argues that the trial court violated the Alabama Uniform Child Abduction Prevention Act ("the AUCAPA"), Ala. Code 1975, § 30-3C-1 et seq. The legislature enacted the AUCAPA in 2011 as a companion statute to the Uniform Child Custody Jurisdiction and Enforcement Act, Ala. Code 1975, § 30-3B-1 et seq. The AUCAPA authorizes a court in this state to order abduction-prevention measures in a child-custody proceeding if the court finds that the evidence establishes a credible risk of abduction of the child. Ala. Code 1975, § 30-3C-4(a). To obtain an abduction-prevention order, a party to a child-custody proceeding must file a verified petition complying with Ala. Code 1975, § 30-3C-6, and setting forth the applicable risk factors for abduction in Ala. Code 1975, § 30-3C-7. In an emergency, a trial court may enter an ex parte order to prevent a child from being abducted. Ala. Code 1975, § 30-3C-8. Upon hearing the petition, if a trial court determines that a credible risk of abduction has been proven, it may impose any number of measures to prevent that abduction. Ala. Code 1975, § 30-3C-9(d).

10

"Abduction" is defined as "[t]he wrongful removal or wrongful retention of a child." Ala. Code 1975, § 30-3C-2(1). "Wrongful removal" means "[t]he taking of a child that breaches rights of custody or visitation given or recognized under the law of this state." § 30-3C-2(10). "Wrongful retention" refers to "[t]he keeping or concealing of a child that breaches rights of custody or visitation given or recognized under the law of this state." § 30-3C-2(11).

In his divorce complaint, the father alleged that the mother had abducted the child by relocating with the child to Oregon. The father requested that the trial court order the child returned to this state. The trial court entered an ex parte order requiring the mother to return to Alabama with the child and directing the parties to maintain the child in Alabama until the final disposition of the case. The mother did not immediately comply with the return order; three months later, the mother brought the child with her to appear at the trial of the case following the entry of a separate order requiring the child's attendance. The trial court determined that the mother had substantially complied with the return order by bringing the child to the trial. The father complains that, because the mother did not return the child to Alabama until the trial date, he was deprived of pendente lite visitation with the

11

child; however, the record contains no motion filed by the father seeking pendente lite visitation, and, if the return order could be considered a pendente lite visitation order, which is doubtful, it was replaced by the final judgment, so we cannot consider any error committed by the trial court in failing to enforce the return order. See Morgan v. Morgan, 183 So. 3d 945, 966 (Ala. Civ. App. 2014), writ quashed, Ex parte Morgan, 183 So. 3d 969 (Ala. 2015), and overruled on other grounds by Ex parte Grimmett, 358 So. 3d 391 (Ala. 2022).

The father also argues that the trial court erred in failing to include in the final judgment abduction-prevention measures because, he says, he proved that the child was at risk of being abducted by the mother. "If, at a hearing on a petition under [the AUCAPA], the court after reviewing the evidence finds a credible risk of abduction of the child, the court shall enter an abduction prevention order." § 30-3C-9(b). In determining whether there is a credible risk of abduction of a child, the court must consider, among other factors, evidence indicating that the respondent has previously abducted or attempted to abduct a child, § 30-3C-7(a)(1); evidence indicating that the respondent has strong familial, financial, or emotional ties to another state, § 30-3C-7(a)(7); or evidence indicating that the respondent has engaged in any other relevant conduct that

would raise the risk of abduction, § 30-3C-7(a)(13). The mother testified that she believed the father needed mental-health treatment. The mother said that she wanted the father out of her life and the child's life, and she hoped that the father would voluntarily relinquish his parental rights to the child. The mother had commenced a new familial relationship with Cook as the head of the household, and she had followed Cook to Oregon. While trying to convince the father to consent to a divorce, the mother had not informed him that she planned to relocate with the child to Oregon. Instead, the mother left Alabama with the child on March 5, 2024, without personally notifying the father of her intentions or her new address. At the conclusion of the trial, the trial court ordered the parties to submit to drug screens; the mother informed the trial court that she used a cannabidiol (CBD) product, and she tested positive for tetrahydrocannabinol (THC). Based on that evidence, the father contends that the mother had abducted the child and that there was a credible risk that she would do so again.

In the final judgment, the trial court determined that the father's abduction argument was "not well taken" because the mother had eventually returned the child to Alabama. The evidence further showed that, within six weeks of moving to Oregon, the mother had provided the

father with a mailing address and the physical address where she and the child were residing. The mother also testified that she had telephoned the father when she had enrolled the child in the Paisley school where the child would be attending kindergarten and that she had sent the father a photograph of the child in front of the school. From that evidence, the trial court impliedly determined that the mother had not abducted the child and that there was no credible risk that the mother would abduct the child in the future. Thus, the trial court did not impose any abduction-prevention measures in the final judgment.

The determination of whether a child is at risk of abduction within the meaning of the AUCAPA is a question of fact for the trial court to determine. See In re Marriage of Badawiyeh, 528 P.3d 194, 198 (Col. App. 2023). The trial court should weigh all the relevant statutory factors in determining whether a credible risk of abduction has been proven. Id. On appeal from a judgment following ore tenus proceedings in a child-custody case, this court accords an especially strong presumption of correctness to the judgment; we will reverse the judgment only if it is found to be plainly and palpably wrong. See Ex parte Byars, 794 So. 2d 345, 347 (Ala. 2001). The trial court showed great attention to the underlying child-custody case, and, after observing the parties and

their interactions with the child, the trial court determined that the child was not at risk of abduction by the mother and that there was no need to impose abduction-prevention measures in the final judgment. The father asked the court to reconsider that determination in his postjudgment motion, and, again, the trial court declined to provide him any relief under the AUCAPA. Under the circumstances, we cannot conclude that the trial court's factual determination was plainly and palpably wrong.

The father next argues that the custody and visitation provisions in the judgment do not promote a meaningful relationship between the father and the child because the child will primarily reside in Oregon with the mother and the father will be able to personally visit with the child only on occasional weekends, during spring and summer breaks, and during Thanksgiving and Christmas holidays every other year.

Because this was an initial child-custody determination between the parties, the trial court was required to determine the custodial arrangement based on the best interests of the child. See Ex parte Byars, supra. At the time of the trial, the parties lived over two thousand miles apart, so joint physical custody was not an option. See Ala. Code 1975, § 30-3-152(a)(5) (requiring a trial court to consider "[t]he geographic proximity of the parents to each other as this relates to the practical

considerations of joint physical custody"). Therefore, the trial court had to determine which of the parties should be awarded sole physical custody of the child. Pursuant to the Alabama Parent-Child Relationship Protection Act ("the APCRPA"), Ala. Code 1975, § 30-3-160 et seq., in making that determination the trial court was required to consider the issue of the change of principal residence of the child to Oregon and the factors set forth in Ala. Code 1975, § 30-3-169.3(a):

> "(1) The nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child's life.

> "(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.

> "(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.

> "(4) The availability and cost of alternate means of communication between the child and the non-relocating party.

> "(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.

16

"(6) The preference of the child, taking into consideration the age and maturity of the child.

"(7) The degree to which a change or proposed change of the principal residence of the child will result in uprooting the child as compared to the degree to which a modification of the custody of the child will result in uprooting the child.

"(8) The extent to which custody and visitation rights have been allowed and exercised.

"(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.

"(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.

"(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.

"(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.

"(13) Whether or not the proposed new residence of a child is to a foreign country whose public policy does not normally enforce the visitation rights of non-custodial parents, which does not have an adequately functioning legal system, or which otherwise presents a substantial risk of specific and serious harm to the child.

"(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.

"(15) The reasons of each person for seeking or opposing a change of principal residence of a child.

"(16) Evidence relating to a history of domestic violence or child abuse.

"(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law."

The father does not argue that the trial court failed to consider those factors.

In some cases, the APCRPA requires a trial court to apply a rebuttable presumption that a relocation out of state is not in the best interests of the child, see Ala. Code 1975, § 30-3-169.4, but that presumption does not apply when making an initial child-custody determination in a divorce proceeding. Lackey v. Lackey, 18 So. 3d 393, 398 (Ala. Civ. App. 2009). Thus, the parties were on equal footing, and the trial court had to weigh the competing factors to determine whether the child should return to Alabama and live with the father or stay with the mother in Oregon. The trial court heard competing testimony from the parties regarding the custody issue. The testimony showed that the mother had been the primary caretaker for the child since her birth and had been a constant parental presence in her life. The mother testified

that the child was thriving in her care and that the custody arrangement the parties had informally implemented for years had benefited the child. The father urged the trial court to award him custody so that he could rebuild his relationship with the child and provide her better educational and recreational opportunities in Alabama, where he intended to stay. Each party enumerated reasons why the other should not receive sole physical custody of the child. After considering that evidence, the trial court determined that the best interests of the child would be served by awarding sole physical custody to the mother. Based on our limited standard of review in child-custody cases, see Ex parte Byars, supra, we cannot say the trial court's determination was plainly and palpably wrong.

Visitation is intended for the benefit of the child, and, when in the best interests and welfare of the child, visitation should be designed to ensure that the child has meaningful involvement with the noncustodial parent. Davis v. Davis, 317 So. 3d 47, 59 (Ala. Civ. App. 2020). In determining the mode and frequency of visitation, a trial court exercises considerable discretion, and its judgment will not be disturbed except for an abuse of discretion. Pratt v. Pratt, 56 So. 3d 638, 641 (Ala. Civ. App. 2010). In this case, the trial court, considering the travel time to Oregon

from Alabama, determined that the father should exercise in-person visitation in Oregon only on long weekends and during extended breaks and holidays to assure that he and the child would have an opportunity to spend time together. Although this court may not have fashioned the same visitation provision, under the circumstances we cannot say that the trial court abused its discretion.

We next address the father's challenges to the child-support award. First, the father contends that the trial court erred in failing to reduce his monthly child-support obligation based on the high transportation costs he will incur by having to fly to Oregon to visit the child. Rule 32(A)(1)(b), Ala. R. Jud. Admin., allows a trial court to deviate from the child-support guidelines to account for, among other things, "[e]xtraordinary costs of transportation for purposes of visitation borne substantially by one parent." The trial court fixed the father's child-support obligation at $668 each month, without considering the costs of transportation. The father argued in his postjudgment motion that his child support should be reduced because he would be solely responsible for the transportation costs when he visits the child in Oregon. The trial court rejected that argument. On appeal, the father points out that the mother testified that she would pay his travel costs to attend visitations

if she was awarded custody, but he does not explain how the trial court erred or abused its discretion in failing to reduce his child-support obligation to cover those costs. Rule 28(a)(10), Ala. R. App. P., requires the appellant to make a fully developed legal argument for reversal of a judgment, and, if the appellant fails to do so, the argument is considered waived. See May v. May, 292 So. 3d 385, 388 (Ala. Civ. App. 2019).

Finally, the father argues that the trial court erred in calculating the interest due on the retroactive child-support award. In the final judgment, the trial court ordered the father to pay child support retroactive to March 2024. At a rate of $668 per month, the father owed the mother a total principal amount of $2,004 ($668 x 3 = $2,004). Initially, the trial court determined that the father owed $150.30 in interest by multiplying the $2,004 arrearage by the postjudgment interest rate of 7.5% per annum. See Ala. Code 1975, § 8-8-10. The father contended in his postjudgment motion that the interest had been miscalculated because each installment of child support became due on the first of the month and interest could be calculated only from the date that the installment was overdue at a rate of .625% per month. See Hollen v. Conley, 840 So. 2d 921, 924 (Ala. Civ. App. 2002). The trial court recalculated the interest and lowered the amount due to $75.17 in

the amended judgment. On appeal, the father argues that the correct amount of interest due as of the date of the entry of the final judgment was $39. Having reviewed the calculations, we find that the correct amount of interest owed on the child-support arrearage is $36.17. We, therefore, reverse the judgment in part and remand the case for the trial court to enter an amended judgment correcting the interest due on the child-support arrearage.

## Conclusion

Based on the foregoing, we affirm all aspects of the trial court's judgment except insofar as it determined the amount of interest due on the child-support arrearage. In that regard, we reverse the trial court's judgment and remand the case with instructions to the trial court to correct the mathematical error in the computation of the interest due and to enter a new judgment awarding the mother interest on the child-support arrearage in the amount of $36.17.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Edwards, Hanson, and Fridy, JJ., concur.

Lewis, J., concurs in the result, without opinion.

22