BRYAN, Judge.
 

 David A. Ladden (“the father”) appeals from a judgment of the Jefferson Circuit Court (“the trial court”) insofar as it denied his petition to change custody of the parties’ daughter (“the child”), ordered the father to pay the attorney fees of Judith H. Ladden (“the mother”), and ordered the father to pay a portion of the fees of the child’s guardian ad litem.
 

 Procedural History
 

 The parties were divorced by the trial court in a final judgment entered on June 18, 1998. Pursuant to the parties’ divorce judgment, the mother was awarded “custody and control” of the child and the father was awarded extensive visitation with the child, including on the first, the third, and, when applicable, the fifth weekend of each month.
 
 [1]
 
 On April 19, 2000, the trial court
 
 *706
 
 entered an order that modified the divorce judgment by, among other things, removing restrictions in the divorce judgment that prevented the child’s residence from being outside Jefferson County and altering the father’s visitation schedule so that the father had visitation with the child only on the first and third weekend of each month.
 
 [2]
 
 The father’s remaining visitation periods, including certain Christian and Jewish holidays, summer visitation, spring-break visitation, birthday visitation, and Father’s Day visitation, remained unchanged.
 

 On May 81, 2007, the father filed a petition to modify the divorce judgment, seeking custody of the child. On December 18, 2007, the mother filed a counter-petition for modification of the divorce judgment, seeking an increased award of child support, modification of the visitation rights of the father, and an award of attorneys fees. In September 2008, the trial court granted the mother’s request to appoint a guardian ad litem on behalf of the child. On April 13, 2009, the trial court conducted an ore tenus hearing on all pending motions. The trial court entered a final judgment on April 30, 2009, that denied the father’s petition to modify custody of the child, reduced the amount of child support payable to the mother, and increased the father’s visitation with the child. The guardian ad litem was awarded fees in the amount of $10,000. Both parties had deposited $2,500 toward the guardian ad litem’s fees, and the father was ordered to pay the remaining balance of the guardian ad litem’s fees, or $5,000. The father was also ordered to pay $25,000 to the mother for her attorney’s fee.
 

 The father filed a motion, pursuant to Rule 59, Ala. R. Civ. P., to alter, amend, or vacate the trial court’s April 30, 2009, judgment. He argued, among other things, that the trial court had erred by using the custody-modification standard set forth in
 
 Ex parte McLendon,
 
 455 So.2d 863 (Ala.1984), that the trial court had improperly excluded the testimony of his expert witness,
 
 [3]
 
 that the trial court had erred in ordering him to pay any portion of the guardian ad litem’s fees, and that the trial court had erred in ordering him to pay $25,000 in attorney fees to the mother. On June 15, 2009, the trial court entered an order “amending and extending” the April 30, 2009, judgment. The trial court clarified the father’s visitation rights and clarified that the father’s obligation to pay $5,000 in guardian ad litem fees was in addition to the $2,500 deposit he (and the mother) had already paid toward the guardian ad litem’s fees. The father timely appealed.
 

 Facts
 

 The mother and the child moved from Birmingham, Alabama, to New Orleans, Louisiana, in 1999. The father moved to Oklahoma in 2000, and he moved to Texas in 2003. The father moved to McComb, Mississippi, in 2004 to be closer to the child. The father stated that he could get to New Orleans from his home in McComb in approximately 1 hour and 15 minutes.
 
 *707
 
 The parties testified that in 2004 they met with a counselor to reach an agreement about visitation at the direction of a judge in Louisiana.
 
 [4]
 
 As a result, the father began exercising additional visitation with the child every Wednesday afternoon and on alternating fifth weekends during the months that had a fifth weekend. The father also attended the child’s soccer games in New Orleans even if it was not his weekend for visitation. The mother stated that she had been flexible and liberal with the father’s visitation and that she had allowed the father to visit the child over and beyond what the April 2000 judgment had awarded the father. It was undisputed that the father had maintained regular visitation with the child since the parties’ divorce regardless of where he was living.
 

 The mother and the child relocated to Birmingham in 2005 after Hurricane Katrina made landfall near New Orleans on Monday, August 29, 2005. The mother’s actions on the weekend before Hurricane Katrina made landfall on the Gulf Coast were discussed at length at the final hearing. The mother stated that she left New Orleans on the Friday before the storm made landfall. She drove to Pensacola, Florida, alone, to meet a man that she had become acquainted with on a dating Web site. During that time, the child stayed in New Orleans with the mother’s mother (“the maternal grandmother”), who was approximately 70 years old at that time. The maternal grandmother and the child were forced to evacuate New Orleans on Sunday, August 28, the day before Hurricane Katrina made landfall. The mother left Pensacola at approximately 4:00 a.m. on Sunday morning to return to New Orleans, but she was unable to return to the city due to the evacuation. The mother drove to Atlanta, Georgia, and the child and the maternal grandmother met the mother in Atlanta after spending three nights in Mobile, Alabama. The father stated that, despite repeated efforts to communicate with the mother in the days before Hurricane Katrina made landfall, he could not get in touch with the mother, the child, or the maternal grandmother.
 

 The mother testified that her home in New Orleans had not flooded after Hurricane Katrina but that the home had been unlivable because there was no electricity, no plumbing, and no safe drinking water. The mother also stated that the schools were not open in New Orleans following the storm. The mother and the child stayed with the mother’s family in Atlanta for a short time, and they eventually returned to Birmingham and stayed with friends. The mother informed the father of her intent to relocate to Birmingham with the child, and the father consented. The mother enrolled the child in school in Birmingham, and the child entered the 5th grade.
 

 According to the father, when the mother informed him of her intent to relocate to Birmingham, the mother agreed to meet the father in Meridian, Mississippi, once a month for visitation exchanges because Meridian was approximately halfway between McComb and Birmingham, which are approximately four and one-half hours apart.
 
 [5]
 
 The mother met the father in
 
 *708
 
 Meridian for visitation exchanges until January 2007. Apparently, after January 2007, the child usually flew from Birmingham to New Orleans to visit the father, and on a few occasions the father drove to Birmingham to pick up the child for visitation. However, the father was not able to exercise mid-week visitation with the child because of the distance between Birmingham and McComb. The father also testified that, after May 2007, the mother did not allow him to visit the child on alternating fifth weekends of the months that had a fifth weekend.
 

 The mother testified that she had had two short-term romantic relationships since she had returned to Birmingham in 2005. She stated that the men with whom she had had those relationships had never stayed overnight at the home that she shared with the child.
 
 [6]
 
 The mother also testified that she had not shared a bedroom with either of her paramours on vacations when the child was present.
 

 At the time of the final hearing, the mother was the Director of Admissions at Highlands Day School in Birmingham and she earned approximately $46,000 a year. The mother stated that she had paid $325,000 for her home in Birmingham in 2005, that she had an outstanding mortgage on her home in the amount of $200,000, and that she had paid cash for renovations on that home in the amount of $300,000. The mother testified that she had approximately $700,000 in various savings and retirement accounts.
 

 The mother married Randy McDonald (“the stepfather”) in December 2007. According to the mother, she did not send wedding invitations to anyone and no one was present for the marriage except the mother and the stepfather. The child was visiting the father in McComb on the day the mother remarried, but the record indicates that the child’s two older siblings “stopped by” the restaurant where the mother and the stepfather had dinner after their nuptials. The mother testified that she and the stepfather hosted a reception to celebrate their marriage on January 1, 2008, and that the child was present on that occasion.
 

 The mother began dating the stepfather in January 2007, and she testified that he frequently came to her home for dinner. The mother denied that the child, more frequently than not, ate dinner alone in the playroom, which the child apparently used as a bedroom. The child testified that, before the mother married the stepfather, she had frequently heard an alarm clock go off at 5:30 in the morning, that she had then heard footsteps, and that she had then heard an automobile drive away. The child alleged that the mother had told her not to tell the father that the stepfather had stayed overnight, but the mother denied this allegation. The mother stated that, on four or five occasions during their courtship, the stepfather had left her home between 4:00 a.m. and 5:00 a.m. after falling asleep on her couch. The mother stated that she and the stepfather, before their marriage, had.never had sexual relations while the child was present and that she and the stepfather had made an effort, for the benefit of the child, to avoid any appearance of impropriety.
 

 
 *709
 
 The father remarried in 2000, and he and his wife, Shelli (“the stepmother”), had a son on August 29, 2005, the same day that Hurricane Katrina made landfall near New Orleans. The father is a eardiothora-cic and vascular surgeon, and, at the time of the final hearing, he was employed by Southwest Mississippi Regional Medical Center. He was also the director of surgical services, and he earned a salary, including a bonus, of approximately $500,000 a year. He testified that he was on-call whenever he was in Mississippi but that he typically had one weekend a month off of work. He stated that his typical work hours are from 8:00 a.m. until anywhere between 3:00 p.m. and 6:00 p.m.
 

 At the time of the final hearing, the child was 14 years old and she was in the 8th grade. The child’s school records revealed that the child generally made As, Bs, and Cs in school. However, the child made a D in science in the third quarter of the 2008-2009 school year. The mother testified that the child had been tutored in New Orleans and that she had again secured a tutor for the child after they relocated to Birmingham. The mother testified that the father had never shared the expense of a tutor with her.
 

 The mother stated that she had asked the child every night if she needed help with her homework. Although the child apparently told the mother that she did not need help with her homework, the mother insisted on helping the child. The mother also regularly contacted the child’s teachers about her performance. The mother stated that the stepfather is a science teacher, that he had also helped the child with her homework, and that there was never an occasion when the child had asked for help that she had refused. The child testified that the mother and the stepfather had helped her with homework, but she stated that the mother did not always understand the subject matter. The mother stated that she limits the child’s extracurricular activities to one sporting activity and one religious activity because, she said, that balance allowed the child ample time to work on her schoolwork.
 

 The father testified that he and the stepmother help the child with homework and school projects when she visits on the weekends and that he had contacted the child’s teachers about her grades. The stepmother took the child to Sylvan Learning Center in the summer of 2004. The father stated that the child had been making Cs in science and that he did not contact her teachers until after she made a D. •
 

 The mother is Jewish, as is the father, and the child also practices Judaism. The mother testified that the child is active in Temple Youth Group and that she was beginning to be involved in B’nai B’rith, a religious social group. The mother’s testimony indicated that she attended temple services with the child on Yom Kippur and Rosh Hashanah but that she and the child did not regularly attend Friday evening or Saturday morning services. However, the mother stated that she occasionally serves dinner at the child’s youth-group functions and that she participates when a special event is planned for the parents. The father stated that McComb does not have a Temple but that he was an active member at a Temple in Jackson, Mississippi, which, according to the father, is approximately 60 miles from his home. The father stated that he regularly attends Shab-bat services, which are on Friday evenings.
 

 The mother stated that she and the child share many of the same interests, such as cooking, singing, shopping, going to the movies, taking trips together, doing crafts together, and painting. The child plays soccer, and the mother stated that she
 
 *710
 
 takes the child to practice and to her games and that she had attended almost every game. The mother stated that the child and the stepfather get along very well and that they had done a wood-working activity together.
 

 The child testified that she and the mother do not cook together, that she and the mother do not go shopping just for her together, that they do not do crafts together, and that they do not read together. She stated that she loved the mother and that she was not angry with her. The child said that she was upset that she was not able to go to the mother’s wedding because she thought that her older siblings had gone to the wedding. She stated that she and the stepfather do not have anything in common, but she agreed that she gets along with him and admitted that they had done a wood-working project together.
 

 The child testified that the mother had called her a “bitch,” a “freak,” a “retard,” a “liar,” and a “spoiled brat.” The child also stated that the mother had spoken negatively about the father to the child by calling him a “fat asshole” and a “liar.” The child further stated that, on one occasion, the mother had chased her with a baseball bat and had knocked a hole through her bedroom door. The child stated that the mother had once grabbed her arm and had left her fingernail imprints in her arm that were visible the next day. According to the child, the mother threw away a Mother’s Day gift that the child had made for her. The child also accused the mother of eavesdropping on her telephone conversations with the father and cutting the tires on her bicycle, although she apparently did not see the mother cut her bicycle tires. The mother denied each of the allegations made by the child.
 

 The father testified that he has a wonderful relationship with the child. The father described the child as a “happy, well-adjusted, active, brilliant child.” The father testified that when the child visits McComb they watch movies, participate in various sporting activities, cook, and scrapbook. The father could not identify any positive attributes about the mother or her “dealings” with the child. The father stated that he never spoke negatively about the mother in the child’s presence.
 

 The child stated that she and the father have a lot of the same interests and that she and the stepmother like to scrapbook, play tennis, and cook together. She stated that she gets along well with the stepmother, that she loves her half brother, and that her best friend lives in McComb. The mother expressed some concern about the child’s friends in Mississippi and expressed concern that the child had a 16-year-old boyfriend in Mississippi, although the child disputed that claim.
 

 The child visited the father in Houston, Texas, on May 2, 2008, and the father stated that, during that visit, he noticed that the child’s lower lip was swollen and bruised and that the child had a bruise on her upper arm. The child stated that the mother had caused bruising on her arms that was visible the weekend that she went to Houston to visit the father. However, at the final hearing, when the child was shown a picture from that weekend taken by the father, the child could not identify any injury to her lip or any bruising on her arm. The father admitted that he had not taken the child to a doctor, had not reported the bruises to the Alabama Department of Human Resources (“DHR”), and had not talked to the mother about the child’s injuries.
 

 On May 6, 2009, following the child’s weekend visit with the father in Houston, the mother received a telephone call from
 
 *711
 
 a caseworker with DHR. The DHR worker informed the mother that the child had filed a complaint against her. Apparently, the child had told her school counselors and the DHR caseworker that the mother had gotten drunk the night before and had slapped her, causing a large scratch on her face. According to the mother, the child eventually told the caseworker from DHR that the father had told her to make a mark on her face so that he could say that the mother had physically abused the child. The child admitted that she had lied when she told a counselor at her school that the mother had gotten drunk and slapped her, causing a scratch on her face. She admitted that she had scratched her own face, but she testified that no one had told her to do it. Following that incident, the mother took the child to see a counselor, Dr. Chancey, for the purpose of making the child more assertive so that she could not be bullied. The father denied telling the child to report an injury to DHR, and he denied ever telling the child to lie about anything.
 

 The father stated that he had taken the child to see a psychologist, Dr. Patricia Brawley, approximately 10 months after filing the petition to change custody to find out what affect a change in residency would have on the child. The father did not inform the mother that he had taken the child to a psychologist. Dr. Brawley testified that she was a licensed professional counselor and that she had been approached by the father to determine whether a move from the child’s school in Alabama to a new school in Mississippi would be detrimental to the child. Dr. Brawley met with the child from March 2008 through December 2008, and she stated that she had formed an opinion as to whether a move from Birmingham to McComb would be disruptive for the child. However, the mother’s counsel objected before Dr. Brawley was able to state her opinion on the record, and the trial court sustained the objection.
 

 Issues
 

 The father raises four issues for this court to review on appeal: (1) whether the trial court committed reversible error by applying the custody-modification standard set forth in
 
 Ex parte McLendon, supra;
 
 (2) whether the trial court committed reversible error by excluding the opinion testimony of Dr. Brawley; (3) whether the trial court committed reversible error by denying the father’s petition to modify custody pursuant to the standard set forth in
 
 Ex parte McLendon, supra;
 
 and (4) whether the trial court committed reversible error in its award of $25,000 in attorneys fees to the mother and its additional requirement that the father pay $7,500 of the guardian ad litem’s fee.
 

 Standard of Review
 

 “ “When ore tenus evidence is presented, a presumption of correctness exists as to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.
 
 J & M Bail Bonding Co. v. Hayes,
 
 748 So.2d 198 (Ala.1999);
 
 Gaston v. Ames,
 
 514 So.2d 877 (Ala.1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court “will assume that the trial judge made those findings necessary to support the judgment.”
 
 Transamerica Commercial Fin. Corp. v. AmSouth Bank,
 
 608 So.2d 375, 378 (Ala.1992). Moreover, “[u]nder the ore tenus rule, the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness.”
 
 Transamerica,
 
 608 So.2d at 378. However, when the trial court
 
 *712
 
 improperly applies the law to [the] facts, no presumption of correctness exists as to the trial court’s judgment.
 
 Allstate Ins. Co. v. Skelton,
 
 675 So.2d 377 (Ala.1996);
 
 Marvin’s, Inc. v. Robertson,
 
 608 So.2d 391 (Ala.1992);
 
 Gaston,
 
 514 So.2d at 878;
 
 Smith v. Style Advertising, Inc.,
 
 470 So.2d 1194 (Ala.1985);
 
 League v. McDonald,
 
 355 So.2d 695 (Ala.1978). “Questions of law are not subject to the ore tenus standard of review.”
 
 Reed v. Board of Trustees for Alabama State Univ.,
 
 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court’s conclusions on legal issues carry no presumption of correctness on appeal.
 
 Ex parte Cash,
 
 624 So.2d 576, 577 (Ala.1993). This court reviews the application of law to facts de novo.
 
 Allstate,
 
 675 So.2d at 379 (“[W]here the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court’s judgment carries no presumption of correctness.”).’ ”
 

 Farmers Ins. Co. v. Price-Williams
 
 As
 
 socs., Inc.,
 
 873 So.2d 252, 254-55 (Ala.Civ.App.2003) (quoting
 
 City of Prattville v. Post,
 
 831 So.2d 622, 627-28 (Ala.Civ.App.2002)).
 

 Discussion
 

 I.
 
 Application of the
 
 Ex parte McLendon
 
 Standard
 

 The father first argues that the trial court erred in applying the custody-modification standard set for in
 
 Ex parte McLen-don
 
 to his petition to modify custody of the child. The father argues that the trial court was required to evaluate his petition to modify custody based on certain provisions found in the Alabama Parent-Child Relationship Protection Act, § 30-3-160 et seq., Ala.Code 1975 (“the Act”). The father argues that, because he lived in McComb and the mother lived in Birmingham, his petition for modification of custody necessarily contemplated a change in the child’s principal residence. Based on this line of reasoning, the father argues that, pursuant to § 30-3-169.7, Ala.Code 1975, the trial court was required to consider the factors set forth in § 30-3-169.3, Ala.Code 1975, in making a determination on the father’s petition to modify custody of the child.
 

 The father’s argument is not well taken. The parties did not dispute the fact that the mother was the “custodial” parent for purposes of a custody-modification analysis. This court and our supreme court have consistently held that a noncustodial parent seeking modification of a pri- or custody determination must meet the custody-modification standard set forth in
 
 Ex parte McLendon, supra. See, e.g., Ex parte Russell,
 
 19 So.3d 886 (Ala.2009); and
 
 McCormick v. Ethridge,
 
 15 So.3d 524 (Ala.Civ.App.2008). The father is essentially arguing that the Act should apply in place of the custody-modification standard set forth in
 
 Ex paite McLendon
 
 because the child’s principal residence would change if his petition for modification was granted. However, the child’s principal residence was not going to change unless the father first satisfied the custody-modification standard set forth in
 
 Ex parte McLendon.
 

 Furthermore, we conclude that § 30-3-169.7, by its own terms, does not apply in this particular case. Section 30-3-169.7 states:
 

 “If the issue of change of principal residence of a child is presented in a petition for divorce or dissolution of a marriage or other petition to determine custody of or visitation with a child, the court shall consider, among other evidence, the factors set forth in Sections
 
 *713
 
 30-3-169.2 and 30-3-169.3
 
 in making its initial
 
 determination.”
 

 (Emphasis added.)
 

 The father correctly points out that “[t]he cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute,”
 
 Ex parte State Dep’t of Revenue,
 
 683 So.2d 980, 983 (Ala.1996) (citing
 
 Gholston v. State,
 
 620 So.2d 719 (Ala.1993)), and that this court is to give the words of a statute their “natural, plain, ordinary, and commonly understood meaning....”
 
 IMED Corp. v. Systems Eng’g Assocs. Corp.,
 
 602 So.2d 344, 346 (Ala.1992).
 
 See also Alabama Educ. Ass’n v. Nelson,
 
 770 So.2d 1057, 1058 (Ala.2000) (citing
 
 Johnson v. Price,
 
 743 So.2d 436, 438 (Ala.1999)) (“In order to ascertain the meaning of a statute, we look first to the plain meaning of the words written by the Legislature”). A plain reading of § 30-3-169.7 reveals that that section is written in the cpntext of a trial court’s making an
 
 initial
 
 custody determination. Thus, we conclude that a plain reading of § 30-3-169.7 indicates that it does not apply in the present case because the trial court was not making an initial custody determination as to the child.
 
 See Lackey v. Lackey,
 
 18 So.3d 393, 399 (Ala.Civ.App.2009) (“Section 30-3-169.7 ... provides that, when ... the issue of relocation is presented in conjunction with an initial custody determination, ‘the court must consider ... the factors set forth in Sections 30-3-169.2 and 30-3-169.3.’ ”).
 

 At first glance, this conclusion seems to be at odds with the term “child custody determination” as defined in the Act at § 30-3-161(3), Ala.Code 1975, because the definition of that phrase includes custody-modification orders. However, § 30-3-161, Ala.Code 1975, states that the definitions of words and phrases defined in that section are applicable in the Act
 
 “unless the context requires a different definition.”
 
 (Emphasis added.) As we stated above, when viewed in its proper context, § 30-3-169.7 relates to an initial determination of custody and does not contemplate a modification of a prior custody order. Therefore, even though the phrase “child custody determination,” as defined'in § 30-3-161(3), includes custody-modification orders, we must conclude that, in its proper context, § 30-3-169.7 requires a definition of “child custody determination” that does not include custody-modification orders.
 
 Cf. Lackey v. Lackey,
 
 18 So.3d at 399 n. 1. Because we have determined that § 30-3-169.7, by its plain language, does not apply to petitions to modify a prior custody determination, we find no error in the trial court’s failure to consider the factors listed in § 30-3-169.3 when it made a determination regarding the father’s petition to modify custody of the child. Thus, we conclude that the trial court properly applied the custody-modification standard set forth in
 
 Ex parte McLendon
 
 to the father’s petition to modify custody of the child.
 

 II.
 
 The Opinion Testimony of Dr. Brawley
 

 The father argues that, even if the trial court properly applied the custody-modification standard set forth in
 
 Ex parte McLendon,
 
 the trial court still committed reversible error in excluding the opinion testimony of his expert witness, Dr. Braw-ley. At the final hearing, the father’s attorney presented Dr. Brawley with a hypothetical situation that summarized the facts and background of the parties, as was set forth in the record. The father’s attorney then asked Dr. Brawley:
 

 “Based upon that hypothetical and based upon your licensed certifications, degrees and background, do you have an opinion as to whether or not if this Court were to change custody and move [the child] from Birmingham, Alabama
 
 *714
 
 living with [the mother] to McComb, Mississippi living with [the father] and [the father’s wife], would be disruptive; do you have an opinion?”
 

 Dr. Brawley then stated that she did have an opinion on the matter, and when the father’s counsel asked what her opinion was, the mother’s attorney objected, and the trial court sustained the objection.
 

 Although the father argues that the exclusion of Dr. Brawley’s opinion testimony was reversible error, pursuant to Rule 45, Ala. R.App. P., even if the trial court erred by excluding proper evidence, this court will not reverse the trial court’s judgment on appeal “unless ..., after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.” Rule 45;
 
 see B.S.L. v. S.E.,
 
 826 So.2d 890, 894 (Ala.Civ.App.2002). After a thorough “examination of the entire cause,” we cannot conclude that the trial court’s exclusion of Dr. Brawley’s testimony “probably injuriously affected substantial rights” of the father.
 
 See
 
 Rule 45. The father argues that the trial court erred in failing to allow Dr. Brawley to state her opinion as to whether moving the child from Birmingham to McComb would be disruptive for the child. However, as stated above, the father was required to meet the custody-modification standard set forth in
 
 Ex parte McLendon,
 
 which
 

 “requires the parent seeking a custody change to demonstrate [ (1) ] that a material change in circumstances has occurred since the previous judgment, [ (2) ] that the child’s best interests will be materially promoted by a change of custody, and [ (3) ] that the benefits of the change will more than offset the
 
 inherently disruptive
 
 effect resulting from the change in custody.
 
 Ex parte McLendon,
 
 455 So.2d at 866.”
 

 Dean v. Dean,
 
 998 So.2d 1060, 1065 (Ala.Civ.App.2008) (emphasis added).
 

 Thus, pursuant to the standard set forth in
 
 Ex parte McLendon,
 
 a trial court presupposes the fact that a change of custody, whether between parents living in the same city or between parents living in different states, has a disruptive effect on a child. Therefore, even if Dr. Brawley had presented testimony indicating that moving the child from Birmingham to McComb would have had very little to no disruptive effect on the child, the trial court, pursuant to
 
 Ex parte McLendon,
 
 was required to evaluate the proposed change in custody with a presumption that the change in custody would have an inherently disruptive effect on the child.
 
 Id.
 
 Accordingly, we conclude that any error the trial court may have committed in failing to allow Dr. Brawley’s testimony regarding whether a relocation from Birmingham to McComb would be disruptive for the child was harmless and does not require reversal of the trial court’s judgment.
 

 III.
 
 Denial of the Father’s Petition to Modify Custody
 

 The father next argues that, even if the trial court applied the proper custody-modification standard, and even if the trial court did not err in excluding the testimony of Dr. Brawley, the trial court still erred in denying his petition to modify custody of the child because, he asserts, he met his burden under
 
 Ex parte McLendon.
 

 First, the father argues that the trial court was required to consider (1) prior changes of residence by the mother, citing
 
 Taft v. Taft,
 
 553 So.2d 1157, 1158 (Ala.Civ.App.1989); (2) the mother’s interference with visitation, citing
 
 Vick v. Vick,
 
 688 So.2d 852, 856 (Ala.Civ.App.1997); and (3) attempts by the mother to diminish the relationship between the father and the
 
 *715
 
 child, citing
 
 Calabrisi v. Boone,
 
 470 So.2d 1255, 1258 (Ala.Civ.App.1985).
 

 After a thorough review of all the evidence in the record, we cannot conclude that the trial court erred in denying the father’s custody-modification petition based on the mother’s changes of residence, the mother’s alleged interference with visitation, or any attempt by the mother to diminish the father’s relationship with the child. The mother’s move to New Orleans in 1999 and her return to Birmingham in 2005 do not rise to a level of instability that this court has relied on when affirming custody modifications in the past.
 
 See Taft v. Taft, supra
 
 (affirming modification of custody from mother to father and noting that the mother and the child had relocated eight times in two years).
 

 Furthermore, we find no evidence in the record to support the father’s argument that the mother had interfered with the father’s
 
 court-ordered
 
 visitation rights with the child. Although evidence indicated that the father could not exercise midweek visitation with the child after the mother returned to Birmingham, that the mother stopped allowing the child to visit the father on alternating fifth weekends of each month that had a fifth weekend, and that the mother stopped meeting the father in Meridian for visitation exchanges, the mother was not required by a court order to make the child available for visitation at those times nor was she required to meet the father in Meridian for visitation exchanges.
 
 See C.D.K.S. v. K.W.K.,
 
 40 So.3d 736, 745 (Ala.Civ.App.2009) (citing
 
 Cochran v. Cochran,
 
 5 So.3d 1220, 1228-29 (Ala.2008)) (“[A] custodial parent is under no legal obligation to continue voluntary supplemental visitation and ... the termination of such visitation does not constitute sufficient grounds to transfer custody of a child.”).
 
 See also Vick v. Vick, supra
 
 (visitation problems alone are insufficient to necessitate a change of custody).
 

 We also find no evidence to support a finding that the mother’s cessation of supplemental visitation was an attempt to diminish the relationship between the father and the child, and, even if it was, there was no evidence indicating that the child’s relationship with the father had been diminished in any way.
 
 See Calabrisi v. Boone,
 
 470 So.2d at 1258 (concluding that the mother had interfered with the father’s visitation but that there was no evidence demonstrating that the mother had planned to diminish the relationship between father and child and that, even if she had, she had had no success in doing so). Although the child testified that the mother had called the father derogatory names in her presence, that evidence was disputed and the child testified regarding her love for the father and her desire to live with him.
 

 Next, the father argues that the trial court was required to consider (1) evidence that the mother was placing her social pursuits ahead of the child, citing
 
 Junkin v. Junkin,
 
 332 So.2d 392, 395-96 (Ala.Civ.App.1976); and (2) evidence of any sexual indiscretions by the mother, citing
 
 Batton v. Batton,
 
 496 So.2d 68, 69 (Ala.Civ.App.1986), and
 
 Smith v. Smith,
 
 464 So.2d 97, 99 (Ala.Civ.App.1984).
 

 In support of his argument, the father points out certain facts that were set forth at the final hearing, such as the mother’s actions in the days that led up to Hurricane Katrina making landfall near New Orleans, the mother’s relationships with two individuals before her marriage to the stepfather, and the stepfather’s overnight visits at the mother’s home before their marriage. The father also points out that the child did not always eat dinner with the mother and the stepfather and that the
 
 *716
 
 mother had not invited the child to her wedding.
 

 In
 
 Junkin v. Junkin, supra,
 
 a case cited by the father, this court affirmed a modification of custody from the mother to the father because there was sufficient evidence to support a finding that the mother placed her “entertainment and social pursuits ahead of her regard for the child.” 332 So.2d at 395. Initially we note that the “entei’tainment and social pursuits” at issue in the present case do not rise nearly to the level of those practiced by the mother in
 
 Junkin.
 
 In that case, we held that “[t]he question is not the presence or absence of sexual activity in [the mother’s] social life; rather, the trial court must determine whether the emphasis on social life, promiscuous or chaste, detracts from a stable, worthwhile home environment for the child.”
 
 Id.
 
 at 395.
 

 In the present case, the trial court heard evidence that would support a conclusion that the mother had not placed her social pursuits above the child. The mother included the child in trips she took with the two individuals that she had dated before she married the stepfather. Also, there is no evidence to support a finding that the mother behaved inappropriately in front of the child with her paramours.
 
 Compare Batton v. Batton,
 
 496 So.2d at 69 (another case cited by the father, in which this court affirmed a modification of custody from the mother to the father after the child testified that the mother had engaged in sexual activity with her paramour while the child was present in the same motel room). Moreover, at the time of the final hearing, the mother had been happily married for over one year and the mother was an active participant in the child’s schooling and extracurricular activities. There was no indication that she had placed her social pursuits above the child or that she had provided anything other than a stable home environment for the child.
 
 Junkin,
 
 332 So.2d at 395.
 

 The father further argues that the trial court was required to consider (1) evidence of the child’s home life if the custodial parent had remarried, citing
 
 Lansdell v. Snoddy,
 
 269 Ala. 344, 113 So.2d 151 (1959), and
 
 Raines v. Baucom,
 
 270 Ala. 706, 708, 121 So.2d 870, 871 (1960); (2) evidence concerning the mother’s supervision of and involvement in the child’s life, citing
 
 Hughston v. Ivey,
 
 479 So.2d 1277, 1278 (Ala.Civ.App.1985); and (3) evidence concerning the mother’s lack of interest in resolving problems in the child’s educational pursuits, citing
 
 Elliott v. Elliott,
 
 560 So.2d 771, 772 (Ala.Civ.App.1990), and
 
 Wesson v. Wesson,
 
 507 So.2d 536, 537-38 (Ala.Civ.App.1987).
 

 The father directs this court’s attention to the child’s testimony that the mother rarely participated in any activities with the child, that the mother had called the child derogatory names, that the mother had not helped the child with her homework, that the mother had slashed her bicycle tires, that the mother had thrown away a gift made by the child, and that the mother had eavesdropped on her telephone conversations. We note that each of those alleged “facts” were disputed at the final hearing by the mother. The mother stated that she went shopping with the child, that she transported the child to soccer practices and games, that she participated in youth activities when appropriate at the Temple, that she constantly sought to help the child with her homework, and that she had not called the child any derogatory names or cut her bicycle tires. Thus, the trial court, as the trier of fact, was free to believe the testimony of the mother over the testimony of the child, whose credibility was called into question by her admitted dishonesty regarding alie-
 
 *717
 
 gations of abuse she made against the mother.
 

 In
 
 Raines v. Baucom, supra,
 
 the supreme court stated that “the effect of a remarriage can be shown with other factors as a circumstance indicating a material change of condition since the divorce.” 270 Ala. at 708, 121 So.2d at 871. The father argues that the child rarely participates in activities with the stepfather. However, we cannot see how this fact would constitute a material change in circumstances when the child testified that she got along well with the stepfather and that she had participated in some activities, such as a wood-working project, with the stepfather. The father also mentions the fact that the mother took the child to services at the Temple only on holy days such as Yom Kippur and Rosh Hashana. However, the trial court also heard evidence indicating that, nonetheless, the child remained involved in Temple activities and organizations, that the mother took the child to the Temple for those activities, and that the only limitation the mother placed on the child’s activities at the Temple was in order to ensure that the child was spending ample time on her schoolwork.
 

 The father also argues that the child’s grades, particularly her science grade, had suffered since she moved to Birmingham and that the only assistance the child had received with her homework was from the father. However, the mother testified that she had constantly sought to help the child with her homework, and the child testified that any time she had asked for the mother’s assistance the mother had provided it. Although the child alleged that the mother did not understand some of the subject matter of her homework, the mother testified that she had hired a tutor to help the child. The evidence in the record indicates that this is not a case in which the child recently began making poor grades and the mother left the child to her own devices. Instead, there is evidence that would support a conclusion that the mother personally provided assistance to the child when permitted by the child and provided further assistance to the child in the form of a tutor. We cannot conclude that the child’s poor grade in science and her otherwise average grades, that were consistent with her prior performance, constitute a material change in circumstances sufficient to modify custody from the mother to the father.
 
 See Galloway v. Harris,
 
 646 So.2d 100, 103 (Ala.Civ.App.1994) (reversing an order modifying custody of a child from the mother to the father and noting that both parents appeared to be concerned and involved in the child’s education).
 

 The father correctly points out that violence perpetrated against the child by the mother is a pertinent consideration in a custody-modification proceeding, citing
 
 E.M.C. v. K.C.Y.,
 
 735 So.2d 1225 (Ala.Civ.App.1999). The father points to the child’s testimony that the mother had chased the child with a baseball bat, leaving a hole in the child’s bedroom door; that the mother had left fingernail imprints on the child’s arm; that the mother had bruised the child’s upper arm; and that the mother had slapped the child, leaving a cut on the child’s lip. Again, that testimony was disputed. The reasoning behind the ore tenus rule and the presumption of correctness that it carries rests on the fact that “[t]he trial court is in the best position to observe the demeanor of witnesses and to assess their credibility.”
 
 Yellow Freight Sys., Inc. v. Green,
 
 612 So.2d 1209, 1211 (Ala.Civ.App.1992). Regarding the abuse allegedly perpetrated by the mother, the trial court could have concluded that the mother’s testimony denying those allegations was more credible
 
 *718
 
 than the child’s. Because one view of the evidence provided sufficient support for the trial court’s implicit conclusion that the mother had not abused the child, we decline to reverse the trial court’s judgment on that basis.
 
 See McClelland v. McClelland,
 
 841 So.2d 1264, 1268 (Ala.Civ.App.2002) (discussing the application of the Custody and Domestic or Family Abuse Act, § 30-3-130 et seq., Ala.Code 1975, and concluding that, in the absence of a specific finding regarding alleged acts of abuse, this court must assume that the alleged acts of abuse did not occur, that they did not constitute domestic abuse, or that both parties were guilty of abusive behavior).
 

 Finally, the father argues that the trial court was required to consider the fact that the child desired to live with the him in McComb in light of the fact that the child had already established relationships in McComb. The father argues that the child enjoyed a great relationship with the stepmother and her half brother, that the child participated in many activities with the father and the stepmother in McComb, and that the child’s best friend lived in McComb. However, the child’s desire to live with the father does not compel the trial court to modify custody; instead, the wishes of the child are only a factor for the trial court to consider.
 
 See Bassett v. Brown,
 
 598 So.2d 936, 937 (Ala.Civ.App.1992); and
 
 C.E. v. C.C.H.,
 
 963 So.2d 131 (Ala.Civ.App.2007) (concluding that there was insufficient evidence to meet the
 
 Ex parte McLendon
 
 standard when the evidence showed that the child wanted to live with the mother, that the child did not like talking to her stepmother, that the father did not spend time with the child, and that the child got to “go places” when she was in the mother’s custody).
 

 We have thoroughly reviewed the record in this matter, and we have seriously considered the wishes and the testimony of the child. However, this court is forbidden from substituting its judgment for the judgment of the trial court when the trial court’s judgment is supported by evidence in the record.
 
 See Horton v. Perkins,
 
 17 So.3d 235, 240-41 (Ala.Civ.App.2009) (citing
 
 Ex parte R.E.C.,
 
 899 So.2d 272, 279 (Ala.2004)) (“Although we may not have reached the same conclusion as the trial court, we cannot reweigh the evidence and substitute our judgment for that of the trial court.”).
 

 “It is seldom that this court will reverse a trial court which has heard a child custody case presented
 
 ore tenus.
 
 As already stated, in such instances, an appellate court presumes the trial court’s judgment is correct and will not reverse unless an abuse of discretion is shown or unless the judgment is so unsupported by the evidence as to be plainly and palpably wrong.”
 

 Calabrisi v. Boone,
 
 470 So.2d at 1257 (citing, among other cases,
 
 Nicholas v. Nicholas,
 
 464 So.2d 527 (Ala.Civ.App.1985)).
 

 Based on the arguments made by the father on appeal, we cannot conclude that the trial court’s judgment denying his petition to modify custody of the child was so unsupported by the evidence as to be plainly or palpably wrong. Although one view of the evidence might present sufficient circumstances to show that a material change in circumstances had occurred since the entry of the parties’ 1998 divorce judgment, we conclude that there is also sufficient evidence to support the trial court’s determination that the father had not met his burden under
 
 Ex parte McLendon.
 
 Thus, we affirm the trial court’s judgment insofar as it denied the father’s petition to modify custody of the child.
 

 
 *719
 
 IV.
 
 The Mother’s Attorney’s Fee and the Guardian Ad Litem’s Fee
 

 Finally, the father argues that the trial court exceeded its discretion in ordering him to pay the mother’s attorney’s fee in the amount of $25,000 and in ordering him to pay $5,000 in fees to the guardian ad litem in addition to the $2,500 that he had already deposited with the clerk of the trial court for the guardian ad litem’s fee. The father argues that the mother had sufficient resources with which to pay her attorney’s fee and to pay 50% of the guardian ad litem’s fees.
 

 “ ‘Whether to award an attorney fee in a domestic relations case is within the sound discretion of the trial court and, absent an abuse of that discretion, its ruling on that question will not be reversed.
 
 Thompson v. Thompson,
 
 650 So.2d 928 (Ala.Civ.App.1994). “Factors to be considered by the trial court when awarding such fees include the financial circumstances of the parties, the parties’ conduct, the results of the litigation, and, where appropriate, the trial court’s knowledge and experience as to the value of the services performed by the attorney.”
 
 Figures v. Figures,
 
 624 So.2d 188, 191 (Ala.Civ.App.1993).’ ”
 

 Lackey v. Lackey,
 
 18 So.3d at 402 (quoting
 
 Glover v. Glover,
 
 678 So.2d 174, 176 (Ala.Civ.App.1996)).
 

 The father does not argue that either award is unreasonable or that he is unable to pay the mother’s attorney’s fee or his portion of the guardian ad litem’s fee. According to the father’s income affidavit, he earns approximately $41,000 a month, whereas the mother earns approximately $46,000 a year. It is also true that the mother has other substantial assets. However, in light of the outcome of the litigation, we find that the trial court did not exceed its discretion by requiring the father to pay $25,000 for the mother’s attorney’s fee or by requiring the father to pay $7,500 of the guardian ad litem’s fee.
 

 Conclusion
 

 Based on the reasoning set forth above, we affirm the trial court’s judgment.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.
 

 [1]
 

 . At the time the parties divorced, the mother was awarded custody of the parties' three minor children. However, at the time the father initiated the present action, the child was the only remaining minor child of the parties. Because the father's custody petition
 
 *706
 
 only sought custody of the child, we will set forth the facts only as they pertain to the child.
 

 [2]
 

 . The mother was found in contempt in March 2000 for removing the child from Jefferson County before the trial court modified the divorce judgment. The father was also found in contempt in March 2000 for violating various provisions of the divorce judgment.
 

 [3]
 

 . The father stated in his postjudgment motion that the testimony of his expert witness was allowed, but our review of the record reveals, and the father’s argument on appeal confirms, that the trial court
 
 excluded
 
 the testimony of the father’s expert witness.
 

 [4]
 

 . The parties agreed that a Louisiana court had never issued an order regarding custody of the child or visitation with the child. The Civil District Court for the Parish of Orleans, State of Louisiana, issued an order on August 27, 2007, that stated that it did not have jurisdiction to entertain custody proceedings regarding the child.
 

 [5]
 

 . There was some contention at the final hearing as to whether an “agreement” had been made between the parties to meet in Meridian, and the father alleged that the par
 
 *708
 
 ties’ alleged agreement to meet in Meridian was why he had consented to allowing the child to move to Birmingham. Either way, it was undisputed that there was not a court order requiring either party to meet in Meridian for visitation exchanges.
 

 [6]
 

 . The mother stated that, on one occasion, she and the child had stayed in New Orleans with a paramour and his daughter. The mother stated that she and the paramour did not sleep together and that they did not engage in any sexual activity on that occasion.