MOORE, Judge.
Mark Ruben Fermín (“the father”) appeals from a judgment of the Lee Circuit Court (“the trial court”) denying his motion to modify physical custody of his two children from his marriage to Lorelei Hundley Lewis (“the mother”).

Procedural History

The procedural facts pertinent to this appeal show that the mother obtained physical custody of the parties’ children when the parties divorced in January 2005. In February 2009, the trial court entered a judgment adopting an agreement of the parties, pursuant to which the mother was allowed to move with the children to West Point, New York. In February or March 2009, the father moved to Pittsburgh, Pennsylvania. On May 6, 2009, the father filed a petition to modify custody of the children, a daughter and a son who, at the time of the final hearing in this matter, were nine and seven years old, respectively. The mother responded on June 10, 2009. The trial court conducted ore tenus hearings regarding the father’s modification petition on February 18 and March 9, 2010. On August 4, 2010, the trial court entered a judgment denying the father’s petition.[1] The father timely filed a post-judgment motion and requested a hearing on that motion. The trial court denied the request for a hearing, and the father’s postjudgment motion was subsequently denied by operation of law on December 1, 2010. See Rule 59.1, Ala. R. Civ. P. The father appealed to this court on January 11, 2011.

The Evidence

The parties’ 2005 divorce judgment awarded the parties joint legal custody of the children, with the mother receiving physical custody and the father receiving certain specified visitation. Following the divorce, the mother and the children resided in Lee County, in the home of the children’s maternal grandparents. The father remarried not long after the parties’ divorce, and the mother remarried in May 2008. The record indicates that, around the time of her remarriage, the mother successfully petitioned the trial court to suspend the father’s visitation. Several months later, the trial court also divested the father of his right to joint legal custody of the children.[2] As stated above, in February 2009, the trial court entered a judgment based on an agreement of the parties that allowed the mother to move with the children into the home of her new husband on a military base in West Point. The judgment awarded the father supervised visitation with the children unless and until *167 the father submitted a positive psychological evaluation, at which time his visitation would become unsupervised, although the father would continue to be subject to random drug testing.
The record indicates that, at the time of the February 2009 judgment, the mother had not disclosed to the father or to the trial court that she and her new husband had engaged in several episodes of domestic violence, which, according to the mother, were fueled in part by her husband’s excessive alcohol consumption. The mother also had not disclosed that, in November 2008, she had had a “mental breakdown” because of the stress relating to the ongoing child-custody litigation with the father. The mother testified that during that breakdown she had become intoxicated, had damaged an interior wall in her home with the butt of her husband’s pistol, had vomited- on her clothes, and had passed out naked on the bathroom floor. The mother’s husband testified that the mother had stated that she wanted to commit suicide at that time.
By her own admission, the mother’s domestic violence, alcohol abuse, and mental-health problems continued in West Point. In March 2009, the mother “scratched” both of her wrists with a steak knife, prompting a weeklong stay in a psychiatric hospital, followed by intensive mental-health counseling and the prescription of anti-anxiety medications. The mother also testified that, on May 11, 2009, following her receipt of the father’s petition to modify custody, she became intoxicated and “out of control,” that she threatened the father in a telephone call with never seeing the children again, and that she threw a glass container and other objects through an upstairs window within earshot of the daughter. The mother testified that, because of that incident, she had been arrested by the military police, had again been hospitalized for a mental evaluation, and had been sentenced to eight hours of community service for disorderly conduct. The mother further testified that she had another domestic altercation with her husband on June 4, 2009, which again required the intervention of the military police.[3] Karen Kozykowski, a senior caseworker for the Orange County Department of Social Services, Child Protective Services Division in New York (“CPS”), testified that, following those incidents, the mother was placed on the New York State Central Registry of Child Abuse and Maltreatment because of alcohol misuse, lack of supervision, and inadequate guardianship and that her appeal from that listing had been denied.
From his testimony, it appears that the father was, at first, totally unaware of the mother’s problems. The father testified that he had filed for a change of custody in May 2009 solely because the mother was interfering with his relationship with the children. The father testified that, although he had fully complied with all the conditions set out in the February 2009 judgment, the mother originally would not agree to his exercising unsupervised visitation. The mother relented, allowing the children to visit with the father for one week in late March 2009, but the mother later claimed that the father had mistreated the children and had smoked around them during that visitation, which the father denied. The mother asserted that the daughter had developed a constant cough, which the mother described as a nervous tick, following that visitation. The father, however, attributed the cough to an aller- *168 gie reaction. Thereafter, the father experienced difficulty arranging visitation and reaching the children by telephone. When he was able to contact the children by telephone, the mother would monitor their telephone calls and would interrupt those calls when she deemed the conversation to be inappropriate. In addition, the mother had informed the father in early May 2009 that she intended to have the children’s names changed. Immediately after the filing of the modification petition, the mother threatened to bar any further contact between the father and the children, and she actually petitioned the trial court to terminate the father’s parental rights in June 2009 as part of her answer and counterclaim.[4] Additionally, the mother told the daughter that the father was trying to “take her away” from the mother.
The father testified that he eventually learned of the mother’s marital and other problems. At some point in June 2009 he again contacted the mother to arrange visitation with the children. The mother informed the father that she had sent the children to stay in the home of their maternal grandparents in Lee County, but she did not state why. The father subsequently received a telephone call from Ko-zykowski informing him of the results of the CPS investigation and inquiring as to his custody petition, which was then pending in the trial court. By that point, the mother had separated from her husband and was undergoing mental-health therapy. The parties subsequently consented to a court order holding that the children should remain in the physical custody of the maternal grandparents, subject to the father’s visitation rights,[5] until the custody-modification petition could be decided.[6]
The mother moved in with the maternal grandparents and the children in July 2009. The mother testified that she had been diagnosed with general anxiety disorder and that she was following her psychiatrist’s recommendations for care. The mother also testified that she had learned a great deal about coping skills and dealing with stress and anxiety and that she had put those skills into practice. Ronnie Hundley, the children’s maternal grandfather, testified that he had not observed any problems with the mother’s husband since the mother moved back to Alabama. The record also contains no evidence of any further breakdowns or other mental-health problems affecting the ability of the mother to care for the children.
The father testified that, after the mother returned to Alabama, she continued to try to alienate him from the children. According to the father, while the mother remained in New York, he was able to communicate with the children through the maternal grandparents in a normal manner, but, he testified, after the mother moved back to Alabama, the children became much more reserved and less open. The father also testified that the mother had used various names for the son when enrolling him in schools. The mother testified that she had never actually changed the name of either child. The father testified that, in September 2009, the mother falsely told the children’s teachers that the son was devising ways to protect himself in *169 the event the father tried to kill him and that the mother instructed the teachers that they did not have any legal obligation to communicate with the father regarding the children. In November 2009, the mother reported to authorities that the father’s wife and his eight-year-old stepdaughter were sexually abusing the son. The mother said that the children had been forced to bathe naked together with the father’s stepdaughter and that the stepdaughter had improperly touched the son.[7] The mother informed the children’s teachers in a November 2009 e-mail that the father, his wife, and his stepdaughter were under investigation for abuse and instructed them not to have any contact with the father. The mother also withheld holiday visitation from the father in December 2009 based on the allegations of sexual abuse.
For her part, the mother testified essentially that she was only acting to protect the children. According to the mother, following visitations, the children would report beatings that the father’s wife would give the stepdaughter and sexual abuse that the stepdaughter would perpetrate on the son. The mother testified that, before visitations with the father, the children would get very upset, resulting in stomach aches, nausea, and crying, and that, right after visitations, the children would have temperament problems, becoming very clingy and not letting her out of their sight. The .children would indicate to the mother that they did not want to go back for visitation. According to the mother, those problems did not arise when the children visited solely with the father and that she did not have any problems with the father’s exercising his overnight visitation or telephone contact with the children by himself. The maternal grandfather testified that both he and the mother actually encouraged the children to visit with the father.
Pursuant to a court order entered in July 2009, the children began seeing Dr. Glen Vollenweider, a clinical psychologist, on a weekly basis. Dr. Vollenweider testified that he had counseled the children regarding the daughter’s anxiety and the son’s behavioral problems, which, he said, stemmed in part from visitations with the father. Dr. Vollenweider opined that the children are stable in their present home environment and that they are safe and comfortable. He testified that he thinks the children are doing well, adjusting pretty well at school, and that they seem to be doing considerably better than they were when they began therapy. The maternal grandfather also testified that the children seem well adjusted and happy but that they experience anxiety regarding their visits with the father and his family in Pittsburgh.
Although generally acknowledging that the children seemed to be doing well, the father noted that the children had accumulated an excessive number of absences at school in addition to arriving tardy repeatedly. The mother stated that the children visit Dr. Vollenweider on Wednesdays from 9:30 a.m. to 11:00 a.m. and that they do not attend school on those days because they would have only two hours of school remaining by the time they arrived, but, she testified, the children always brought home their schoolwork. The *170 mother admitted that she had never attempted to change the counseling schedule in order to better accommodate the children’s school schedules.
The father testified that he has stable employment and a home in Pittsburgh. He testified that he had researched schools and counseling services in his area. He testified that he was willing to work with the mother so that they could both enjoy a healthy relationship with the children and that he would be willing to assist with the cost of transportation for the mother to visit the children in Pittsburgh. The father testified that he had not had a positive drug screen since September 2008. Dr. Vollenweider opined that there would be serious adjustment for the children if the father obtained custody, that the children have significant concerns and fears about being back in the father’s home, and that the children are attached to the mother.

Analysis

The father initially argues on appeal that the trial court erred in allowing the testimony of Dr. Vollenweider because the mother did not seasonably supplement her discovery responses to disclose that she would use Dr. Vollenweider as an expert witness. The record indicates that, in September 2009, the father requested information regarding any expert witnesses the mother expected to call at trial, but the mother did not formally reveal before trial that she would be calling Dr. Vollenweider. The father evidently learned that the mother would call Dr. Vollenweider when the mother’s attorney issued a subpoena for his trial attendance on February 11, 2010. At the outset of the trial, the father objected to Dr. Vollenweider’s testifying based on the mother’s failure to earlier supplement her discovery responses to identify Dr. Vollenweider as an expert witness and to disclose the substance of his expected testimony. The trial court did not immediately rule on the objection. On March 5, 2010, the mother formally notified the father that she would be calling Dr. Vollenweider as part of her case, but she did not disclose the substance of his expected testimony. When the trial continued on March 9, 2010, the father renewed his objection, but the trial court overruled that objection.
Rule 26(e)(1), Ala. R. Civ. P., provides, in pertinent part:
“A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
“(1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert witness is expected to testify, and the substance of the witness’s testimony.”
Neither the text of Rule 26(e)(1) nor cases construing the rule have held that a trial court may not allow the testimony of an expert witness for a party who has failed to comply with the rule. See Alabama Power Co. v. Courtney, 539 So.2d 170 (Ala.1988) (upholding trial court’s decision to allow testimony of an expert disclosed only six days prior to trial). Alabama caselaw has consistently held that whether to allow or to refuse testimony of an expert witness who has not been previously designated through discovery is within the sound discretion of the trial court. CSX Transp., Inc. v. Battiste, 578 So.2d 1065, 1067 (Ala.1991) (citing Electrolux Motor AB v. *171 Chancellor, 486 So.2d 414 (Ala.1986); and Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), overruled on other grounds by Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250 (Ala.1998)). Hence, on appeal, we must determine whether the trial court exceeded its discretion in allowing Dr. Vol-lenweider to testify.
The record reveals that, before the trial, the father was aware that Dr. Vollenweider had long been counseling the children, having twice personally met with Dr. Vol-lenweider and having several times talked with Dr. Vollenweider over the telephone. Furthermore, the mother’s attorney indicated to the trial court that the mother had listed Dr. Vollenweider as a treating mental-health-care professional in her discovery responses and that certain reports issued by Dr. Vollenweider had been provided to the father. When the father learned that Dr. Vollenweider would testify at trial, the father did not ask for a continuance in order to obtain further information regarding his expected testimony. Additionally, the record does not reveal any efforts undertaken by the father to depose Dr. Vollenweider or to otherwise obtain a summary of his expected testimony during the recess of the trial. See Erwin v. Sanders, 294 Ala. 649, 652, 320 So.2d 662, 664 (1975) (taking into account a party’s failure to take ameliorative measures as a factor in holding that lower court did not exceed its discretion in allowing previously undisclosed expert testimony). Furthermore, the father does not argue that he was surprised by the content of Dr. Vollenweider’s testimony or explain how more timely discovery would have allowed him to conduct a more effective cross-examination of Dr. Vollenweider.
More fundamentally, this case involves the central question of whether two children should be removed from the physical custody of their mother and transferred to the physical custody of their father. In deciding that issue, a trial court must determine the effects of the proposed change on the children at issue. See Ex parte McLendon, 455 So.2d 863, 865 (Ala.1984). Because trial courts are entrusted to protect the interests of children “with scrupulous care,” Vaughn v. Vaughn, 473 So.2d 1090, 1091 (Ala.Civ.App.1985), a trial court should be inclined to admit expert testimony as to the psychological implications of a change of custody as an aid in reaching its decision. See 1 Judith S. Crit-tenden & Charles P. Kindregan, Jr., Alabama Family Law § 10:8 (Thomson Reuters/West 2008) (“Expert testimony, for example, that children’s best psychological interests would be served by being in custody of one parent or other, can be of great assistance to trial courts attempting to discern a child’s best interests and parents’ abilities to discern and properly address those interests.” (footnote omitted)). Such expert testimony should be disclosed in a timely manner, but a trial court may properly determine that its primary concern for ascertaining and protecting the best interests of the children overrides any competing considerations, such as technical noncompliance with Rule 26(e)(1), especially in a case in which the opposing party cannot articulate any real prejudice to his or her case or the judicial process.
Given the circumstances, and the context, we decline to hold that the trial court exceeded its discretion in allowing the testimony of Dr. Vollenweider despite the fact that the mother violated Rule 26(e)(1).
 The father next argues that the trial court erred in denying his petition for a change of custody. The father acknowledges that he had to meet a very high burden of proof in order to prevail on his petition.
*172 “A parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon [, 455 So.2d 863 (Ala.1984) ]. Under that standard, the parent seeking to modify custody of a child must demonstrate that there has been a material change in circumstances, that the proposed change in custody will materially promote the child’s best interests, and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, supra.”
Adams v. Adams, 21 So.3d 1247, 1252 (Ala.Civ.App.2009). The father argues, however, that he more than satisfied that standard by proving the mental instability and irrational decision-making of the mother, as well as her repeated attempts to interfere with his relationship with the children, and that the trial court exceeded its discretion in failing to award him physical custody of the children. We disagree.
From the evidence, the trial court could have determined that, at the time of trial, the children were happy, well adjusted, and thriving in the physical custody of the mother and their extended maternal family in Lee County. By all accounts, the children were also doing well academically. The record contains no evidence indicating that the children exhibited any residual emotional or mental-health issues because of the incidents that occurred in 2008 and 2009 while the mother was living with her current husband. To the contrary, Dr. Vollenweider testified that the children actually have a close emotional attachment to the mother. From that evidence, the trial court could have concluded that removing the children from the physical custody of the mother would only harm the children psychologically, as Dr. Vollenweider testified. Moreover, the father presented very little evidence as to how the change of custody would benefit the children other than to offer them an alternative stable environment.
We do not excuse the misconduct of the mother in exposing the children to domestic violence and alcohol abuse. However, the law recognizes that a parent may make errors in child-rearing, yet it also recognizes that a parent can rehabilitate himself or herself in order to assume proper custody and care of a child. See Ex parte Phillips, 266 Ala. 198, 200, 95 So.2d 77, 79 (1957) (“ A finding of unfitness may be superseded by changed and improved conduct.’ ” (quoting Lockard v. Lockard, 102 N.E.2d 747, 748, 63 Ohio Law Abs. 549 (Ct. of Common Pleas 1951))); Edwards v. Sessions, 254 Ala. 522, 524, 48 So.2d 771, 772 (1950) (“The mother has made mistakes, grievous mistakes, but this should not be sufficient to take the child from the mother if the mother shows indications of becoming a good mother and is presently able reasonably to care for the child.”); and Borsdorf v. Mills, 49 Ala.App. 658, 661-62, 275 So.2d 338, 340-41 (Civ.App.1973). Based on the evidence, the trial court could have determined that the mother’s problems were in the past and that she, with the aid of the children’s extended maternal family, see Sessions, 48 So.2d at 772 (citing recently extended family assistance as a factor in favor of restoring custody to formerly wayward parent), could best provide for the children. Our standard of review does not allow us to overturn that factual determination. See Ladden v. Ladden, 49 So.3d 702, 718 (Ala.Civ.App.2010) (“[TJhis court is forbidden from substituting its judgment for the judgment of the trial court when the trial court’s judgment is supported by evidence in the record.”).
This court further does not condone any effort by a custodial parent to alienate a *173 child from a noncustodial parent. It is the public policy of this state that children should have frequent and meaningful contact with both fit parents, regardless of the custodial situation following a divorce. See Ala.Code 1975, § 30-3-150. However, in this case, it appears that the trial court instituted measures designed to effectively preserve the father’s role in the lives of the children despite the physical distance between them. The judgment restores the father’s joint-legal-custody rights so that the father now has equal authority to make decisions with the mother regarding the children. See Ala.Code 1975, § 30-3-151(2). The judgment further provides the father with specific and liberal visitation rights and removes all restrictions on his visitation. In addition, the judgment awards the father telephone access to the children three times per week. Based on the evidence, the trial court reasonably could have concluded that those provisions, rather than a traumatic change of physical custody, would best secure the relationship between the father and the children.
Finally, the father argues that the trial court erred in failing to hold a hearing on his postjudgment motion. Rule 59(g), Ala. R. Civ.App., provides that post-judgment motions “shall not be ruled upon until the parties have had opportunity to be heard thereon.” In Knight v. Knight, 53 So.3d 942, 957 (Ala.Civ.App.2010), this court stated:
“The father last argues that the trial court erred in failing to conduct a hearing on his postjudgment motion. Such a hearing is required when it is requested. Rule 59(g), Ala. R. Civ. P. However, the failure to conduct a hearing on a postjudgment motion is not necessarily reversible error. Kitchens v. Maye, 623 So.2d 1082, 1089 (Ala.1993).
“ ‘Harmless error occurs, within the context of a Rule 59(g) motion, where there is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.’
“Greene v. Thompson, 554 So.2d 376, 381 (Ala.1989). In this case, we have already determined that the father has failed to demonstrate error with regard to those issues that were presented to the trial court in his postjudgment motion. Accordingly, we decline to reverse the trial court’s judgment based on its failure to conduct a hearing on the father’s postjudgment motion. Kitchens v. Maye, supra; Greene v. Thompson, supra.”
In the present case, the father asserted in his postjudgment motion that the trial court had failed to properly weigh the evidence and had erred by awarding the mother primary physical custody of the children. As discussed above, we have already determined that the trial court’s judgment was supported by the evidence. As in Knight, we conclude that the trial court’s failure to conduct a hearing on the father’s postjudgment motion was harmless error, and we decline to reverse based on that failure.
AFFIRMED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. The trial court did modify the previous custody judgment in many respects that will be discussed later, but the trial court did not transfer physical custody of the children from the mother to the father.

. That order does not appear in the record on appeal; however, it is referenced in the father’s petition that initiated the present action.

. The mother also testified to other incidences of domestic violence between herself and her husband preceding that altercation.

. The trial court did not have jurisdiction over the petition, and the mother eventually withdrew it.

. The parties agreed that the father would visit with the children for two consecutive weeks in July 2009. The trial court again conditioned the father's visitation on passing drag tests and further ordered that the children were to be enrolled in counseling upon returning from visitation with the father.

.Upon learning that the children would be residing with the maternal grandparents in Alabama, CPS closed its case on July 2, 2009.

. The father testified that, to his knowledge, the sexual-abuse allegations were unfounded but that he had not received any final reports or anything in writing. He testified that the Pennsylvania youth-services agency had indicated that it was closing its investigation. The father testified that Lori Terrell from the Lee County Department of Human Resources had telephoned him to let him know that the department had not had any indications that there had been any wrongdoing.